Amy Jo WINGATE, by her Guardian
and Conservator, Margaret
CARLISLE, Appellant,

v.

LESTER E. COX MEDICAL
CENTER, Respondent.

No. 75376.

Supreme Court of Missouri,
En Banc.

May 25, 1993.

John Woodell, Robert L. Bruer, Springfield, for appellant.

Michael J. Patton, Donald R. Duncan, Springfield, for respondent.

BENTON, Judge.

Amy Jo Wingate sued Lester E. Cox Medical Center for negligently treating her after an automobile accident. The jury—after less than two hours of deliberation—returned a defendant's verdict by a 9–3 vote. Wingate appealed to the Court of Appeals, Southern District, and this Court granted transfer. Affirmed.

Wingate asserts as trial errors: (1) not granting a new trial because a juror failed to disclose two previous lawsuits against him; (2) not granting a new trial because the juror also failed to disclose longstanding bias against lawsuits and the people who bring them; (3) refusing to admit evidence on hospital procedure; and (4) failing to admit expert testimony.

## I.

On October 6, 1987, Wingate was injured in an automobile accident near Springfield, Missouri. The driver, two other passengers and Wingate were riding in a car that left the road, went down an embankment, overturned, and hit a telephone pole.

When an ambulance arrived, a paramedic observed the other three people on the ground, and Wingate still in the car. Approaching Wingate, he heard "gargling respirations" indicating labored breathing. Determining that Wingate was the most severely injured of the four, he treated her first. An emergency medical technician assisted.

Fearing a cervical spinal injury, the paramedic secured her head. While assessing her breathing, the paramedic slid a board into the overturned car and under her body. While on the board, she was pulled out of the auto. The paramedic continued to hear the gargling noise indicating that fluid still obstructed her airway. He suctioned Wingate's throat to remove built-up fluid and intubated her (inserted a tube into the mouth to ease breathing). He again

suctioned the fluid. Upon hearing the rescue helicopter, he left Wingate with the emergency medical technician and went to treat the other victims.

When the helicopter arrived, a flight nurse—a Cox Medical Center employee—took charge of Wingate's care. The nurse, in order to determine if the breathing tube were properly placed, listened to Wingate's "lung sounds" with a stethoscope and wrote on a chart "breath sounds equal." She then listened to the "belly or the epigastrium" with the stethoscope, observing Wingate's chest rising and falling. The ambulance took Wingate to the helicopter which had landed about one-half mile away. Wingate was loaded on the helicopter and flown to Cox South Hospital. The nurse continued to monitor Wingate's airway throughout the flight until she entered the emergency room.

A respiratory therapist and a physician then discovered that the breathing tube was improperly positioned. The tube was in her esophagus (food passageway) rather than her trachea (air passageway). The physician re-intubated Wingate and began supplying her with 100% oxygen. Based on tests to determine the amount of oxygen in the blood, the physician concluded that Wingate was hypotoxic (oxygen deficient).

Wingate was in a coma for about three months before she slowly began to awaken. She is severely brain damaged, and cannot speak, swallow, nor initiate any movement.

## II.

██ Wingate claims she should receive a new trial because a juror failed to disclose that he had been sued on two previous occasions. During the sworn voir dire examination of the venire, no party asked any question about previous lawsuits. Traditionally, failing to ask a question on voir dire waives the right to challenge the juror on any grounds not asked. *State v. Walton*, 796 S.W.2d 374, 379 (Mo. banc 1990).

Before trial, Wingate's attorney prepared a questionnaire for all prospective jurors, and had it approved by the trial judge and Cox's attorney. One question was:

Have you ever been sued by anyone? ( ) Yes ( ) No If so, please explain:

The juror checked the "No" box and returned the questionnaire to the court. In fact, he had been sued twice in 1971. Both attorneys and the judge received a copy of the questionnaire. During the day-and-a-half voir dire, both attorneys obliquely referred to the questionnaire about twelve times. The venire was not asked to affirm its answers to the questionnaire. Unlike *State v. Lumsden*, 589 S.W.2d 226, 229 (Mo. banc 1979), the judge did not bar questions on issues in the questionnaire.

The issue is whether Wingate's attorney justifiably relied on the answer in the questionnaire, and was thus excused from asking voir dire questions about previous lawsuits. This Court has long held that an attorney may not rely on unauthorized court customs during jury selection. *Allen v. Chicago, R.I. & P. Ry. Co.*, 327 Mo. 526, 37 S.W.2d 607, 609 (1931); *see also* Lyman Field, *Voir Dire Examination—A Neglected Art*, 33 UMKC L.Rev. 171, 175 (1965) (interpreting *Allen*). In *Allen*, by court custom, a judge checked the statutory qualifications of all potential jurors before seating them for voir dire. Two unqualified jurors (they could not write English) voted to return a verdict for the plaintiff. The defense attorney requested a new trial because the jurors were unqualified, and the attorney relied on court custom to weed out statutorily unqualified jurors. Following *Knight v. Kansas City*, 119 S.W. 990 (Mo.App.1909), this Court concluded that attorneys were obligated to examine the qualifications of the jurors and could not rely on court custom:

As defendants saw fit to rely on this unauthorized custom and refrain from examining the jurors as to their qualifications and challenging disqualified persons for cause, it is too late after verdict to complain of disqualification of jurors, in face of the positive mandate of the

statute that no exception to a juror shall be allowed after the jury is sworn.[1]

*Allen,* 37 S.W.2d at 609.

Wingate, however, argues that the questionnaire was not an unauthorized custom but rather legislatively mandated under § 494.415[2]. The issue then becomes whether Wingate's questionnaire qualifies as a § 494.415 questionnaire. The standard is whether the questionnaire "substantially complied" with the statute.

The legislature has seen fit to prescribe the manner of selecting juries. The officers charged with this duty must at least substantially comply with the procedure prescribed.

*State v. McGoldrick,* 361 Mo. 737, 236 S.W.2d 306, 308 (1951); *see also Sullivan v. Kansas City Public Service Co.,* 363 Mo. 68, 248 S.W.2d 605, 607 (1952); *State v. Gresham,* 637 S.W.2d 20, 25 (Mo. banc 1982); *State v. Sumowski,* 794 S.W.2d 643, 647 (Mo. banc 1990).

In this case, the questionnaire sent to the jurors fails to comply substantially with § 494.415. It was not approved by the circuit court en banc for use in all cases, but by a single judge for use in a single case. It did not contain instructions that it be returned within ten days. It did not require the juror to declare that the responses are true to the best of his knowledge; it only requested the juror to answer "as completely and honestly as possible". It did not inquire into automatic disqualifications. § 494.415.1(3). A proper juror qualification form shall elicit information about automatic disqualifications.[3] In this case, of the 14 questions posed to the jurors, three (at most) even concern juror qualification.

The trial court committed no error in denying Wingate a new trial based on a questionnaire that fails to comply substantially with the statutory requirements of § 494.415.[4]

### III.

After the trial, Wingate's attorney visited the juror's home to inquire about the trial. Three days later, Wingate's trial consultant interviewed the juror. Two days after that, the juror answered more questions and gave a sworn statement at the attorney's office. The juror voluntarily participated in all these interviews. The attorney also deposed the three jurors not joining the verdict, and the three alternate jurors. Based on this information, the at-

---

1. The present-day statute on challenges for cause parallels the statute at issue in *Allen. Compare* § 6608 RSMo 1919 *with* § 494.470. All citations are to RSMo Supp.1992, unless otherwise indicated.

2. § 494.415, as applicable here, states:

1. .... The board of jury commissioners [the presiding judge, the circuit clerk, and the county clerk] shall cause to be served in a manner prescribed by law for the service of summons or by ordinary mail, as determined by the board, a summons for jury service and a juror qualification form. The juror qualification form shall be approved by the circuit court en banc and shall:
(1) Contain instructions to fill out and return the form within ten days;
(2) Contain the prospective juror's declaration that his responses are true to the best of his knowledge; and
(3) Elicit information concerning the prospective juror's qualifications ...

3. § 494.425 establishes basic juror qualifications:

The following persons shall be disqualified from serving as a petit or grand juror:

(1) Any person who is less than twenty-one years of age;
(2) Any person not a citizen of the United States;
(3) Any person not a resident of the county or city not within a county served by the court issuing the summons;
(4) Any person who has been convicted of a felony, unless such person has been restored to his civil rights;
(5) Any person unable to read, speak and understand the English language;
(6) Any person on active duty in the armed forces of the United States or any member of the organized militia on active duty under order of the governor;
(7) Any licensed attorney at law;
(8) Any judge of a court of record;
(9) Any person who, in the judgment of the court or the board of jury commissioners, is incapable of performing the duties of a juror because of mental or physical illness or infirmity.

4. The issue of reliance on a questionnaire substantially complying with § 494.415 is not properly before this Court, and is not decided by this opinion.

torney filed a new trial motion on the basis that the juror did not disclose, during voir dire, a longstanding bias against lawsuits and the people who bring them. The trial court held a post-trial hearing and denied the motion. Wingate claims this ruling was erroneous.

The first issue is the scope of evidence that may be used to prove the juror's bias. At the post-trial hearing, the court admitted: 1) depositions of the three alternate jurors and the three jurors not joining the verdict; 2) testimony from the trial consultant; and 3) testimony from the allegedly biased juror.

 It is a "well-founded and long-established rule, based on sound public policy, ... that the affidavit or testimony of a juror is inadmissible and is not to be received in evidence for the purpose of impeaching the verdict of a jury." *Smugala v. Campana*, 404 S.W.2d 713, 717 (Mo. 1966). Alternate jurors are likewise precluded from testifying in a manner that impeaches a verdict. *See State v. Ferguson*, 353 Mo. 46, 182 S.W.2d 38, 45 (1944). The rule extends to juror conduct either inside or outside the jury room. *McDaniel v. Lovelace*, 439 S.W.2d 906, 909 (Mo.1969). The depositions included comments made by the allegedly biased juror during the trial's recesses and deliberations.

Wingate argues that the depositions fall within the narrow exception provided by *Flat River v. Edgar*, 412 S.W.2d 537 (Mo. App.1967), which admitted a juror's deposition that other jurors refused to participate in deliberations on religious grounds, and were thus ineligible to serve. No court has approvingly cited *Flat River*. *State v. Campbell*, 433 S.W.2d 606, 618 (Mo.App. 1968); *Roach v. Consolidated Forwarding Co.*, 665 S.W.2d 675, 679 (Mo.App.1984). Five years after *Flat River*, this Court summarily refused juror testimony that two jurors failed to answer voir dire questions truthfully. *Mayberry v. Clarkson Construction Co.*, 482 S.W.2d 721, 724 (Mo.1972). This Court reaffirms *Mayberry*; *Flat River* should no longer be followed.

On appeal, this Court does not consider the depositions because they impeach the verdict. By this rule, the testimony of the allegedly biased juror and the trial consultant are admissible.

 *Williams v. Barnes Hospital*, 736 S.W.2d 33, 36 (Mo. banc 1987), states Missouri's test for juror nondisclosure. Intentional nondisclosure occurs when the prospective juror has no reasonable inability to understand the question, and the juror actually remembers the experience or the juror's forgetfulness is unreasonable. Unintentional nondisclosure occurs when the experience forgotten was insignificant or remote in time, or when the juror reasonably misunderstands the question posed. *Id.* at 36.

 Nondisclosure occurs only after a party asks a clear question. Wingate complains that the juror did not reveal his true attitude about lawsuits. After five hours of voir dire questions, Wingate's attorney first refers to attitudes by stating: "I'd like to ask you now about your experience and your opinions about lawsuits." This preface is followed by the question: "Have any of you ever served as witnesses in a civil suit?" This question, regardless of the preface, does not require a juror to answer with views on lawsuits. *Stallings v. Washington University*, 794 S.W.2d 264, 267 (Mo.App.1990). However, Wingate's lawyer later asks:

Is there anyone who, for religious reasons or personal convictions, just a personal feeling that you hold strongly, anyone who just believes that you shouldn't file a lawsuit, shouldn't bring a lawsuit, it's wrong to do? Anyone who believes that?

No prospective juror answered at all. This question does seek to elicit the subjective state of mind of prospective jurors toward lawsuits. As Wingate correctly argues, the prospective jurors' silence is the same as a response that they don't have strong religious or personal feelings against lawsuits.

Were the juror's true thoughts about lawsuits different from his voir dire "answer"? If his thoughts are the same, he

has disclosed everything that the voir dire question requires and no nondisclosure of any kind occurred. At the post-trial hearing, the juror was asked to express his thoughts about lawsuits. The following excerpts give the hearing's general tenor. When asked to explain his statement—during the interview at his home—that he "didn't believe in lawsuits then and I don't believe in them now", he responded:

I still don't believe in lawsuits if they're for no unearthly cause. We've got so many lawsuits today go on just for the fact of getting money, and that's what I meant when I was making that statement.

In answering a similar question, he responded:

When I realized what this case was, I had no problem with this lawsuit. But had it been a case that was something foolish, yes, I probably would have raised my hand and said I couldn't go along with this lawsuit because it's foolish.

When asked to explain an answer that he turned against lawyers and judges because of an incident early in his life, he responded:

[A]t the time anybody goes to court and has to stand in front of a judge, he gets a bad outlook immediately, when he walks out of that courtroom he feels bad. In due time and process that all healed and you get a different outlook.

When asked to explain why he did not bring a lawsuit when his car was destroyed by fault of another party, he answered:

The people paid for the car, it was taken care of. I didn't have any reason for a lawsuit. I wasn't hurt. I'm not out to rook somebody out of money.

When asked if he had strong feelings that lawsuits affect insurance rates, he responded:

Oh, I don't know—you're putting that a little bit high. I don't know as I have strong feelings. I think I have truthful feelings. There's a big difference.

The trial consultant's testimony dealt primarily with the juror's responses during the consultant's interview. These responses were consistent with the juror's testimony at the hearing, as just summarized.

■■■ The determination of nondisclosure is left to the discretion of the trial judge whose ruling is disturbed only by showing abuse of discretion. *Williams*, 736 S.W.2d at 36. In *Shirrell v. Missouri Edison Co.*, 535 S.W.2d 446, 448 (Mo. banc 1976), this Court defined "abuse of discretion":

Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable men can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

The trial judge, after assessing the juror's credibility, denied the motion for a new trial. There is ample evidence to support the trial court. This Court finds no abuse of discretion.

### IV.

■■■ One of Wingate's experts testified to the proper steps for placing and assessing a breathing tube. Wingate sought to corroborate that evidence with a "protocol" prepared by Cox Medical Center outlining the steps its employees should take to place and assess breathing tubes, and to document the procedures. The protocol was "formulated" in December 1989; the accident occurred in October 1987. Cox objected that the protocol was irrelevant and a "subsequent remedial measure". The trial court excluded the protocol; Wingate claims error.

■■■ Evidence of subsequent remedial measures is not admissible to prove antecedent negligence but may be admissible for other purposes. *Diversified Metals Corp. v. Aaron Ferer Inc.*, 498 S.W.2d 783, 786 (Mo.1973). Wingate argues that the protocol was not a subsequent remedial measure because it is "a written form of the very same procedure in effect in 1987." However, during the offer of proof, Wingate's attorney conceded that the 1987 pro-

cedure was only to intubate the patient; "[n]ow they have one [1989 protocol] that says how you do it, how you assess it, and how you chart it."

Wingate also argues that, even if the 1989 protocol were a subsequent remedial measure, it was admissible to show that the nurse "had adequate time and opportunity to chart the details of the treatment." However, the nurse's ability or opportunity to chart the treatment was never an issue. Cox's attorney, during the offer of proof, stated:

> [s]o that the offer of proof won't be misconstrued: If ... plaintiff's lawyer asks [the nurse], "Could you have written down all these details in October of 1987," she is going to answer, "yes, I could have." So there really isn't a dispute about that.

The dispute is whether failure to make notations on the chart may be negligent. This is precisely the kind of evidence that the "subsequent remedial measure" rule prohibits. *See also Fletcher v. Kansas City*, 812 S.W.2d 562 (Mo.App.1991).

## V.

Wingate's last claim of error is that her expert, a paramedic, was precluded from giving his opinion whether the "hypoxia shown by [Wingate's] blood tests could occur as a result of extubation at the helicopter off-load." The court permitted a voir dire examination of the expert to determine his qualifications to testify on this matter. The court concluded that the expert, whose testimony covers nearly 300 pages in the record, was not qualified to interpret blood gas reports.

The trial court has discretion to determine an expert's qualifications to testify on specific matters. *Parlow v. Dan Hamm Drayage Co.*, 391 S.W.2d 315, 325 (Mo.1965). The trial judge determined that the witness was not an expert in the field of blood gasses and thus refused his testimony. In addition, Wingate suffered no prejudice because the expert later testified, without reference to blood gas results, that the tube was dislodged very soon after intubation.

## VI.

The judgment of the circuit court is affirmed.

ROBERTSON, C.J., COVINGTON, THOMAS, PRICE and LIMBAUGH, JJ., and KENNEDY, Special Judge, concur.

HOLSTEIN, J., not sitting.