Nicholas **GRAB**, by and through his Next Friends, Andrew **GRAB** and Michelle **Grab**, and Andrew **Grab** and Michelle **Grab**, individually, Appellants,

v.

Patrick A. **DILLON**, M.D., Cardinal Glennon Children's Hospital, and Saint Louis University, Respondents.

No. ED 81073.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 18, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 10, 2003.

Application for Transfer Denied May 27, 2003.

**232**

Drew C. Baebler, Michael L. Nepple, St. Louis, MO, for appellants.

Timothy J. Gearin, Cynthia A. Sciuto, Jeffrey T. McPherson, St. Louis, MO, for respondents.

MARY R. RUSSELL, Presiding Judge.

Andrew and Michelle Grab ("Parents"), individually and as next friends for Nicholas Grab, appeal from a judgment entered on a jury verdict rendered in favor of Patrick A. Dillon, M.D., Cardinal Glennon Children's Hospital, and Saint Louis University (collectively "Defendants").[1] On appeal, Parents assert the trial court erred in (1) failing to invoke "the rule" excluding witnesses from the courtroom, (2) refusing to admit into evidence a letter from one of Parents' experts, and (3) failing to grant a new trial for juror misconduct during *voir dire*. We find no error and affirm.

Seven weeks after the birth of their son, Nicholas, Parents noticed swelling in his scrotal area. They took him to see Dr. Dillon, a pediatric surgeon at Cardinal Glennon Children's Hospital. Upon examining Nicholas, Dr. Dillon noted that he had swelling in his scrotum caused by a hydrocele, which is an accumulation of fluid in a sac around the testicle. Nicholas had swelling on both sides of his scrotum, and Dr. Dillon recommended that a bilateral hydrocele operation be performed.

A brief discussion of anatomy is important for a full understanding of this case. During development in a male fetus, the

---

1. Other defendants named in Parents' petition were dismissed prior to trial.

testicles travel from the abdominal area through the processus vaginalis into the scrotum. The processus vaginalis is a lining that runs from the abdominal cavity into the scrotum. Once the testicles have moved into the scrotum, the processus vaginalis seals. If the processus vaginalis fails to seal, fluid from the abdominal cavity can travel and accumulate in the scrotum. During a hydrocele operation, the connection between the abdominal cavity and the scrotum is sealed and the fluid is drained from the sac around the testicles.

After surgery, specimens removed from Nicholas were sent to pathology. Dr. Dillon was informed that the slides appeared to contain epididymis, indicating that the epididymis had been transected during surgery. The head of the epididymis contains numerous channels that eventually become the single channel known as the vas deferens. The vas deferens is the channel that sperm travel through after being created in the testicle.

Depending on the location of the transection of the epididymis, sterility could result. Transection at the head of the epididymis might not cause sterility because the head has numerous channels to support sperm travel to the vas deferens. A cut that occurs lower on the epididymis, where the channels form one duct, is more likely to result in sterility. The epididymis must be transected on both sides, however, for sterility to occur.

Parents filed this medical malpractice suit individually, and on behalf of their minor son, Nicholas, in the circuit court of the City of St. Louis. Parents alleged that Defendants negligently transected the left and right sides of Nicholas' epididymis thereby rendering him sterile.

At trial, Parents introduced evidence from numerous pathologists and surgeons that the slides from Nicholas' surgery contained epididymis and that Dr. Dillon

deviated from the standard of care. Defendants presented evidence from other pathologists and surgeons that Dr. Dillon did not deviate from the standard of care because the slides did not show epididymis, but rather embryonal remnants, which are small, non-functioning portions of tissue from gestation. Experts from both sides testified that it is difficult to distinguish true epididymis from embryonal remnants and that there would be no way to definitively know whether Nicholas was rendered sterile until he reached puberty. The jury returned a verdict for Defendants, and Parents now appeal from that verdict.

## I. Court Denied Invoking "The Rule"

In their first point on appeal, Parents allege the trial court erred in failing to invoke "the rule" excluding witnesses from the courtroom. Parents argue that the denial of their request resulted in Defendants' expert, Dr. Baird Smith ("Expert"), being in the courtroom while defendant Dr. Dillon was testifying. Parents argue that the court's ruling allowed Expert to change his trial testimony from that given in his deposition based on hearing Dr. Dillon's testimony.

Prior to trial, neither party requested that witnesses be excluded from the courtroom while other witnesses were testifying. After Parents had presented their case to the jury and Defendants had put on their first witness, Parents moved to exclude Expert from the courtroom during Dr. Dillon's testimony. The trial court overruled Parents' motion, finding in part that no one had requested invoking "the rule" before commencement of the case.

### A. Evolution of "The Rule"

Parents' attorney's request that "the rule" be invoked to exclude witnesses from

the courtroom is an established practice by trial attorneys. Most attorneys, when seeking to invoke "the rule," however, do not cite to any statutory or common law authority. Although "the rule" has long been a part of Missouri law, no cases contain a discussion of the inception of "the rule" or of its integration into the laws of this state.

The practice of separating witnesses in both criminal and civil trials for the purpose of "the discovery of truth and the detection and exposure of falsehood" is thought to be of the same antiquity as judicature itself, having long been administered in the British Parliament and the courts of both England and Scotland. 1 S.D. THOMPSON, THOMPSON ON TRIALS, sections 275–76, at 283–84 (1912). Its ancient roots lie in the Germanic common law. 6 JOHN H. WIGMORE, WIGMORE ON EVIDENCE section 1837, at 456 (1976).

As trial by jury gained popularity as a mode of trial in England after the 1400s and reliance by jurors on the testimony of witnesses became paramount, it was quite natural that the practice of excluding witnesses under certain conditions would be continually applied in English courts.[2] Commenting on the evolution of this ancestor to "the rule," Wigmore remarked: "There is perhaps no testimonial expedient which, with as long a history, has persisted in this manner without essential change." *Id.*

With the spread of printing and the popularity of the Bible in the early 17th century, litigants frequently based their arguments for the exclusion of witnesses from the courtroom by citing the story of Daniel's judgment of Susanna from the Book of Susanna contained in the Book of the Apocrypha.[3] In this book, two elders coveted Susanna. Susanna 1:8. They blackmailed her by stating that if she did not sleep with them, they would bear false witness against her and charge her with adultery. *Id.* at 1:21. When she resisted, the two elders plotted against her and testified about her adulterous behavior. *Id.* at 1:27–40. The assembly believed the elders and condemned Susanna to death. *Id.* at 1:41. As she was being led to her death, Daniel came to her rescue. *Id.* at 1:45–46. He exclaimed to the assembly:

> Put these two aside one far from another, and I will examine them. So when they were put asunder one from another, he called one of them, and said unto him .... [n]ow then, if thou hast seen her, tell me, Under what tree sawest thou them companying together? Who answered, Under a mastick tree.... So he put him aside, and commanded to bring the other, and said unto him .... [n]ow therefore tell me, Under what tree didst thou take them companying together? Who answered, Under an holm tree.... With that all the assembly cried out with a loud voice, and praised God, who saveth them that trust in him. And they arose against the two elders,

---

**2.** *See Hudson's Trial,* 22 How. St. Tr. 1019 (1793); *Canning's Trial,* 19 How. St. Tr. 330 (1754); *Rosewell's Trial,* 10 How. St. Tr. 147 (1684); *Guilliams v. Hulie,* 1 Sid. 131 (1665); *Earl of Essex's Trial,* (1600), 1 Jardine's Crim. Tr. 349 (1832); *Duke of Norfolk's Trial,* (1571), 1 Jardine's Crim. Tr. 191 (1832), *all noted in* 6 JOHN H. WIGMORE, WIGMORE ON EVIDENCE section 1837, at 457 n. 10 (1976).

**3.** The Book of the Apocrypha was not accepted as part of Scripture, and it was originally

placed in the Bible between the Old and New Testaments merely for its historical value. In 1825, the British and Foreign Bible Society agreed that the book should be removed completely, and from that time on it has been eliminated from almost all English Bibles. *The Authorized Version and The Apocrypha,* at http://www.revelationwebsite.co.uk/index1/kjv/apo.htm.

for Daniel had convicted them of false witness by their own mouth....

*Id.* at 1:51–61.[4]

Under early English doctrine, a motion to exclude witnesses was not grantable as of right, but rather at the discretion of the trial court. *Rex v. Cook,* 13 How. St. Tr. 348 (1696) *noted in* 1 SIMON GREENLEAF, THE LAW OF EVIDENCE, section 432, at 551 n. 1 (6th ed. 1852) (finding a motion to exclude witnesses to be grantable of favor only and at the discretion of the trial court).

As part of the common law of England, "the rule" was formally received into the law of the Territory of Missouri in 1816.[5] When Missouri achieved statehood in 1821, the English common law was similarly integrated into the laws of the state. Section 1.010 RSMo 2000.[6]

Application of "the rule" began appearing in Missouri case law by the early 19th century. *See State v. Hughes,* 71 Mo. 633, 636 (Mo.1880) (finding that court may, in its discretion, exclude witness from courtroom as it sees fit in order to meet the requirements of justice in each particular case); *Keith v. Wilson,* 6 Mo. 435, 441–42 (Mo.1840) (holding that court did not err in failing to exclude witness who had remained in courtroom while another witness testified despite having been "put under the rule"); *King v. State,* 1 Mo. 717, 718 (Mo.1827) (concluding that court's refusal to put witness under "the rule" was rightful exercise of discretion and was not error). In *State v. Compton,* 317 Mo. 475, 296 S.W. 137 (1927), the Supreme Court of

Missouri stated that "it was early held in this State that putting witnesses under the rule rests in the sound discretion of the trial court." *Id.* at 138.

The supreme court explained the logic of following the English precedent of granting the trial court discretion to invoke "the rule" in *Crews v. Kansas City Public Service Co.,* 341 Mo. 1090, 111 S.W.2d 54, 60 (1937):[7]

> We think this is the better view because it never has been considered necessary by courts or lawyers to enforce the rule in all cases, and it might be used to unnecessarily delay and obstruct trials. Courts should not arbitrarily refuse to enforce it, but neither should litigants or lawyers be permitted to arbitrarily require it. The propriety of the exercise of discretion to refuse its enforcement must necessarily be determined in the light of the circumstances of the particular case.

In *Crews,* the defendant argued that the trial court abused its discretion in denying his request for the "separation and sequestration" of witnesses. *Id.* at 60. The trial court denied the request because it was made after opening statements had been given. *Id.* In affirming the trial court's ruling, the supreme court found that the trial court's denial of the request based on untimeliness was not arbitrary, even if it was the sole grounds for denial, and that adoption of a rule of practice requiring

---

**4.** *See also Fenwick's Trial,* 13 How. St. Tr. 537 (1696); *Cook's Trial,* 13 How. St. Tr. 311 (1696); *Sidney's Trial,* 9 How. St. Tr. 817 (1693); *Sir Walter's Trial,* (1603), 1 Jardine's Crim. Tr. 389, 419 (1832), *all noted in* WIGMORE, *supra* note 2, section 1837, at 456 n. 5.

**5.** Laws of the Territories, Ch. 154, sec. 1, pg. 436 (1842).

**6.** All future statutory references are to RSMo 2000 unless otherwise indicated.

**7.** *But see* FED.R.EVID. 615 (finding that a motion to exclude a witness from the courtroom is generally grantable as of right and on the court's own motion).

invoking "the rule" before opening statements was not unreasonable. *Id.*

■ Recent decisions of our court regarding invoking "the rule" find the matter to be within the sound discretion of the trial court, and we will reverse its ruling only upon a showing of abuse and prejudice. *In re T.E.*, 35 S.W.3d 497, 506–07 (Mo.App.2001); *Carlisle v. Kroger Co.*, 809 S.W.2d 23, 25 (Mo.App.1991).

## B. Refusal to Invoke "The Rule" Not Abuse of Discretion

■ Parents' request that "the rule" be invoked was made after two full days of trial and six testifying witnesses. Parents argue that no prejudice to Defendants would have resulted from the court's invocation of "the rule" at the time it was requested because no potential witnesses were present in the courtroom during Parents' case-in-chief. We find Parents' decision to exclude their witnesses from the courtroom was a matter of trial strategy. They cannot now be heard to complain, especially when the record reflects that invoking "the rule" was contemplated and discarded by Parents at the beginning of trial.

Parents cite *Hoffman v. Rotskoff*, 715 S.W.2d 538 (Mo.App.1986), for the proposition that Missouri law is clear that "the rule" can be invoked at any time during trial proceedings. In *Hoffman*, the defendant requested that witnesses be excluded from the courtroom after the plaintiffs' first expert witness testified on direct examination. *Id.* at 544. The trial court granted the defendant's request. *Id.* On appeal, we noted that the decision to sequester witnesses rested within the sound discretion of the trial court and that the plaintiffs made no showing that they were prejudiced by the sequestration, nor would we infer prejudice from the circumstances. *Id.*

We disagree with Parents' characterization of this case. *Hoffman* holds that the trial court's decision will not be overturned absent an abuse of discretion and prejudice. *Id.* After reviewing the totality of the circumstances in *Hoffman*, including that the request to invoke "the rule" was made on the second day of trial, the appellate court found there to be no prejudice to the complaining party. Prejudice to the parties, not the timing of the request, was the basis for the decision in *Hoffman*.

Here, the trial court considered the totality of the circumstances, including the discussion by counsel of invoking "the rule" prior to trial and the choice not to do so, the timing of the request to exclude witnesses, and the number of witnesses who testified before the request. In looking at the circumstances surrounding the trial court's refusal to invoke "the rule," we find that it did not abuse its sound discretion.

## C. Court Relied On Section 490.065.3

The court also denied invocation of "the rule" based on section 490.065.3. This section governs the admissibility of expert testimony and provides:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those *perceived by or made known to him at or before the hearing* and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

Section 490.065.3 (emphasis added).

On its face, this section contemplates that an expert's testimony may be based upon facts or data perceived by or made known to the expert at trial. Federal Rule of Evidence 703, with language similar to section 490.065.3, also provides that an ex-

pert may base an opinion or inference on facts or data perceived by or made known to the expert at or before the hearing. *See Peterson v. Nat'l Carriers, Inc.,* 972 S.W.2d 349, 354 (Mo.App.1998). Under Rule 703, the facts, data, or opinions relied upon may then be disclosed to the jury on direct or cross-examination to assist it in evaluating the expert's opinion by considering the bases. *Peterson,* 972 S.W.2d at 354–55.

We find the trial court did not abuse its broad discretion in allowing Expert to be present in the courtroom for Dr. Dillon's testimony as section 490.065.3 allows Expert to base his opinion on facts or data made known to him at trial. Parents agree that section 490.065.3 would appear to allow Expert to give testimony based upon facts perceived by or made known to him at trial, but argue that the statute certainly does not authorize an expert to change his opinions or the bases thereof. Moreover, Parents contend that discovery rules provide for an opposing party to find out what opinions an expert holds and the bases thereof by means of deposition testimony and that case law imposes an ongoing duty to supplement answers given by an expert in deposition. Parents, therefore, argue the trial court erred because Expert was able to render new opinions based upon the trial testimony of Dr. Dillon.

### D. Parents Failed To Object At Trial That Expert Changed His Testimony

In support of their position, Parents cite the case of *Whitted v. Healthline Management, Inc.,* 90 S.W.3d 470 (Mo. App.2002). In *Whitted,* this court upheld the grant of a new trial due to a change in an expert's testimony between deposition and trial. *Id.* at 477. *Whitted,* however, differs from the facts here, as Parents have failed to preserve for our review the

issue of whether Expert's testimony changed between deposition and trial.

After the defense had called one witness, Parents made a motion to invoke "the rule" to exclude Expert from the courtroom during the testimony of Dr. Dillon. The trial court denied Parents' request and allowed Expert to hear Dr. Dillon's testimony before he testified. When Expert testified next, Parents did not object to or move to strike his testimony based upon a change in the bases of his opinions. Parents' failure to object at trial does not preserve this issue for appellate review. *Yaeger v. Olympic Marine Co.,* 983 S.W.2d 173, 185 (Mo.App.1998).

Parents also did not include Expert's change in opinion as an allegation of error in their motion for new trial or in their points on appeal. Rather, their motion for new trial and their points on appeal assign error only in the trial court's refusal to invoke "the rule." To properly preserve an allegation of error, it must be raised in a motion for new trial. *Id.* In addition, an argument not set out in the point relied on but referenced in the argument portion of the brief does not comply with Rule 84.04(d), and the point is deemed abandoned in this court. *Brizendine v. Conrad,* 71 S.W.3d 587, 593 (Mo. banc 2002). Thus, Parents' allegation that Expert changed his testimony from deposition to trial has not been preserved for our review.

Finally, we note that Parents' attorney cross-examined Expert regarding the bases for his opinions. Cross-examination revealed that Expert's deposition testimony, which was based on Dr. Dillon's operative report, differed from Expert's trial testimony, which was based in part on Dr. Dillon's trial testimony. Thus, the jury could evaluate for itself the credibility and reliability of Expert's opinions. *See Peter-*

*son,* 972 S.W.2d at 354–55. Point one is denied.

## II. Parents' Expert's Second Letter Inadmissible

█ In their second point on appeal, Parents allege the trial court erred in refusing to admit into evidence the second letter of their expert, Dr. Paul Merguerian. This second letter discussed the review of Nicholas' pathology slides by a pediatric pathologist at Dr. Merguerian's hospital. Parents argue that the letter was admissible under section 490.065, which provides that an expert may disclose the bases of his opinions, even if it is hearsay.

Dr. Merguerian was retained by Parents to evaluate the standard of care used by Dr. Dillon. After reviewing Nicholas' medical records, Dr. Merguerian wrote a letter to Parents' counsel stating that the pathology reports were consistent with a finding of epididymis, and that if the tissue was indeed epididymis, then Dr. Dillon deviated from the standard of care. The letter went on to state that if the tissue showed embryonal remnants, there would be no effect on sterility. The letter recommended that an experienced pathologist, such as Dr. Edwina J. Popek, evaluate the pathology slides to determine if they contained epididymis or embryonal remnants.

Dr. Merguerian later had the pathology slides reviewed by a pediatric pathologist at his own hospital, who determined that the slides contained true epididymis. Dr. Merguerian then wrote the following second letter to Parents' counsel:

> I received you [sic] letter dated October 11th including the pathology reports, the drawing and the pathology slides. I have reviewed the pathology reports and have also reviewed the pathology slides with a Pediatric Pathologist here at the Hospital for Sick Children. This pathologist wishes to remain anonymous as he is not interested in being an expert witness on the case.
>
> The pathology slides show a section of the hernia sac and in one area there is a structure that resembles epididymis. The pathologist is certain that this is indeed epididymis and not a remnant. He stated that remnants are usually scattered throughout the sac and the number of tubules in a remnant is usually small. The pathology slide you sent me showed the tubules to be centered in one area with large number of tubules consistent with a true epididymis.

The trial court refused to admit this second letter into evidence for two reasons. First, Dr. Merguerian testified at his deposition that he was not going to rely on this anonymous pediatric pathologist in forming his opinions. Second, Parents had presented evidence from numerous other pathologists stating that the pathology slides contained true epididymis.

█ "It is recognized that a trial court does not commit reversible error merely by excluding expert testimony even if it is relevant and admissible." *Destin v. Sears, Roebuck & Co.,* 803 S.W.2d 113, 116 (Mo.App.1990). The admission or exclusion of expert testimony is within the sound discretion of the trial court, and we will not disturb this ruling absent a clear abuse of discretion. *Greer v. Cont'l Gaming Co.,* 5 S.W.3d 559, 565 (Mo.App.1999). We will find a clear abuse of discretion when the court's ruling is against the logic of the circumstances or when it is arbitrary and unreasonable. *Id.* Where evidence has been excluded, the issue is not whether the evidence was admissible, but rather whether the trial court abused its discretion in excluding it. *Govreau v. Nu–*

*Way Concrete Forms, Inc.*, 73 S.W.3d 737, 743 (Mo.App.2002).

Parents allege that the second letter should have been admitted into evidence as it formed the bases of Dr. Merguerian's opinions, and section 490.065.3 allows an expert to base his opinions on hearsay as long as it is of the "type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable."

■ We agree with Parents that an expert is not prohibited from relying on hearsay in recognition of the generally accepted principle that an expert acquires his knowledge and expertise from a variety of sources, some of which may be inadmissible hearsay. *See Peterson v. Nat'l Carriers, Inc.*, 972 S.W.2d 349, 354 (Mo.App. 1998). Reliance on information and the opinions of others does not automatically disqualify an expert's testimony. *See id.* " 'As long as such sources serve only as a background for his opinion and are not offered as independent substantive evidence ... he should not be precluded from testifying.' " *See id.* (*quoting State ex rel. Mo. Highway & Transp. Comm'n v. Delmar Gardens of Chesterfield, Inc.*, 872 S.W.2d 178, 182 (Mo.App.1994)).

Dr. Merguerian testified at his deposition that he did not intend to rely on the review performed by the pediatric pathologist:

> Q. At the time of trial, do you intend to rely on the review performed by [the pediatric pathologist] as part of the basis for forming your opinions in this case?

A. No, I don't. I will rely on any pathologist that says if this—I'm not a pathologist. I wanted to know his opinion if it's true epididymis or not. That's all I wanted to know from him.[8]

As Dr. Merguerian testified at his deposition that he would not be relying on the pediatric pathologist's review in forming his opinions in the case, section 490.065.3 is not implicated.

■ Moreover, the purpose behind allowing an expert to explain the bases of his opinions is that " 'the professional judgment of the expert as to the reliability of the basis facts [is] a substitute for the traditional process of producing a series of witnesses to establish them.' " *Peterson*, 972 S.W.2d at 355 (*quoting* McCormick on Evidence section 324.2 (Edward W. Cleary ed., 3d ed. Supp.1987)). Our court has previously upheld the exclusion of expert testimony based upon the fact that the expert was attempting to rely on anonymous sources unavailable for cross-examination. *See State ex rel. Mo. Highway & Transp. Comm'n v. Sturmfels Farm Ltd. P'ship*, 795 S.W.2d 581, 590 (Mo.App.1990).

In *Sturmfels Farm*, we upheld the exclusion of an expert appraiser's opinion as to why the city had rezoned a parcel of property because his opinion on that subject was formed on the basis of conversations he had with anonymous city officials. *Id.* at 589. "The credibility of this basis evidence depended wholly on the credibility of anonymous declarants unavailable for cross-examination." *Id.* at 590.

---

8. In their brief, Parents attempt to argue that when Dr. Merguerian's deposition is read in context, his testimony was not that he did not intend to rely on the pediatric pathologist's review, but rather that the pediatric pathologist did not want to get involved in the case. First, we note that in support of this argument, Parents cite a portion of the appendix to their brief that is incorrect and unpersuasive. Second, we cannot review the testimony in context as Parents did not provide us with Dr. Merguerian's entire deposition.

We find the trial court did not abuse its sound discretion in refusing to admit Dr. Merguerian's second letter because the credibility of the contents of the second letter depended upon the credibility of a pathologist who preferred not to be involved in the case.

Parents argue that the trial court nevertheless abused its discretion in denying admission of the second letter because the "ruling left the jury with the misplaced assumption that Dr. Merguerian never found any fault with Dr. Dillon's surgery until he testified on the stand at the trial." Also, the fact that Dr. Merguerian's first letter suggested the slides be reviewed by an experienced pathologist such as Dr. Popek may have misled the jury into thinking that Parents had the slides reviewed by Dr. Popek who then testified for Defendants or that Parents were afraid to have Dr. Popek look at them.

First, Dr. Merguerian testified at trial that based upon his review and the review of all of the pathologists, Dr. Dillon deviated from the standard of care because the slides contained epididymis. We are not persuaded by Parents' argument that they were prejudiced because, without the second letter, it appeared as if Dr. Merguerian did not conclude that Dr. Dillon deviated from the standard of care until trial. We find that Parents were not prejudiced by Dr. Merguerian rendering his opinion at trial as the substance of the opinion is of greater value to the fact-finder than when it was formed.

Second, it was Parents' standard of care expert, Dr. Merguerian, who specifically named an experienced pathologist, Dr. Popek, in his first letter as being an appropriate expert. The fact that Dr. Popek eventually testified for Defendants cannot be said to prejudice Parents. The idea that the jury might believe Parents were afraid to have Dr. Popek review the slides is vitiated by the fact that numerous other pathologists testified for Parents that the slides contained epididymis.

Finally, Parents acknowledge in their brief that the pediatric pathologist "came to the same conclusion as five other pathologists who reviewed the slides." It is typically considered proper to exclude cumulative evidence. *Destin*, 803 S.W.2d at 116. Given that the pediatric pathologist's opinion that the slides contained epididymis was merely cumulative to the opinion of numerous other pathologists, Parents have failed to show how they were prejudiced by the exclusion of Dr. Merguerian's second letter. Point two is denied.

### III. Juror Misconduct Challenged

In Parents' third point on appeal, they assert the trial court erred in denying their motion for new trial because of juror misconduct during *voir dire*. They claim that juror Alexander ("Juror") intentionally failed to disclose that he was previously sued for negligence in a personal injury action that resulted in a $193,000 judgment against him.

Parties to a lawsuit have a constitutional right to a fair and impartial jury. *Keltner v. K–Mart Corp.*, 42 S.W.3d 716, 721 (Mo.App.2001). " 'The essential purpose of *voir dire* is to provide for the selection of a fair and impartial jury through questions which permit the intelligent development of facts which may form the basis of challenges for cause, and to learn such facts as might be useful in intelligently executing peremptory challenges.' " *Id. (quoting Pollard v. Whitener*, 965 S.W.2d 281, 286 (Mo.App.1998)). *Voir dire* also gives parties the opportunity to expose a potential juror's biases in the type of suit being tried. *Id.* It is the duty of venirepersons to fully, fairly, and truthfully answer all questions so that

qualifications for service may be determined and challenges properly exercised. *Id.* Jurors are not the judges of their own qualifications to serve. *Id.*

 The findings of the trial court when ruling on a motion for new trial on the grounds of juror misconduct are given great weight, and we will not disturb these findings on appeal unless the trial court abused its discretion. *Moore ex rel. Moore v. Bi–State Dev. Agency,* 87 S.W.3d 279, 288 (Mo.App.2002). We also note that courts should not overturn a jury verdict lightly. *Id.; see also Keltner,* 42 S.W.3d at 722.

### A. Was *Voir Dire* Question Clear?

 Nondisclosure occurs only after a clear question posed to the jury panel unequivocally triggers a duty to respond. *Moore,* 87 S.W.3d at 288. Thus, the first question to be answered when determining whether juror nondisclosure has occurred is: was the question the juror is alleged to have failed to answer clear? *Id.* Our review of the clarity of the questions is *de novo,* and the standard for clarity is whether a lay person would reasonably conclude that the undisclosed information was solicited by the question. *Keltner,* 42 S.W.3d at 723. If the question is not clear, there has been no nondisclosure. *Moore,* 87 S.W.3d at 288.

During *voir dire,* Parents' attorney asked the jury panel the following questions:

> Has anybody had a claim for personal injury—okay, several hands. I appreciate this. Let me finish this question—claim for personal injury whether its filed in court and ends up in front of a jury or just that you got money from an insurance company or anything like that for personal injury? And let me tell you how important this is. Cases—and His Honor allud-

ed to this before—cases have been overturned just because a juror forgot to say that they had a claim because there's a big computer somewhere that has everybody's name on it and that can be checked. So if you have had any claim for personal injury, I want to see your hands.

. . . .

> Now, the three of you that have just spoken all talked about medical malpractice claims. I want to make sure that you all know because most personal injury cases are not medical malpractice claims. I am including like auto accident claims where, you know, you might have been injured. A slip and fall claim. Any claim for personal injury, okay. Did you all understand that when I was asking that? Okay.

. . . .

> Let me flip it around here. Anybody had claims for personal injury against you where you were the defendant either brought into a case or you had to contact your insurance company or something and say, look, they're making a claim against me because I did this. Have any of you had a claim against you? How about anybody here?

Juror did not respond to any of these questions when posed to the jury panel. In their motion for new trial, Parents asserted that Juror intentionally failed to disclose that he was a defendant in a personal injury action filed in the City of St. Louis in 1998. At a post-trial hearing, Juror testified that in 1994, he was employed as a cab driver. One day, while stopped at a gas station, a woman with whom Juror had just spent time with at a nearby hotel took his cab, which he had been leasing at the time. The cab was

later involved in a hit-and-run accident that injured a pedestrian.

While Juror recalled receiving a letter stating that he was going to be sued by the pedestrian, he testified that he was not aware that a lawsuit was actually filed against him. The record shows that the sheriff achieved service of process on Juror by leaving a copy of the petition with his stepdaughter at his residence. Juror testified, however, that he did not receive the petition.

Juror took the letter he received to the cab company's lawyer, who informed him that he needed to retain separate counsel. Juror believed that because he was working for and insured by the cab company, he did not need to hire a lawyer. Juror testified that a year later, he was called back to the cab company office and was told that "it was all cleared up." Juror stated that he was unaware that a default judgment had been entered against him in the amount of $193,000 or that there was an attempt to garnish his wages to collect this judgment.

In response to questions from Parents' attorney at the hearing, Juror admitted that he did not respond during *voir dire* to the question about claims made against him:

Q. Dealing with the '94 incident and the letters that you received, why didn't you raise your hand and talk about this claim being made against you for personal injury?

A. Because, like I said, I forgot all about it even happening because I didn't go to court on it or—all I got was one letter about it. And, like I said, it just slipped my mind. I don't—that's why I didn't say nothing about it because, you know, like I say, they said it was all over with. And I just blocked it out of my mind, you know.

. . . .

A. I only heard about [the claim] twice. Like I said, I got a letter the first time, and they told me to come down. I went down to the cab stand and talked to them, then I went down and talked to the lawyer, came down and talked to his lawyer but I don't know who his lawyer was. But I came down and talked to him, and he said, well, I can't represent you so you probably have to get—you have to get your own lawyer. So I didn't hear anything else about it for awhile. So I finally called again and they told me to come down and I went down and talked to the cab stand. And they told me that it was all over with. So I didn't even—didn't even go into it anymore.

Q. Did you ask them whether money was paid for you or what happened to the claim against you or anything like that?

A. I didn't ask. They just told me it was all over with and didn't ask me anything else. So I just wanted to get it out of my mind.

. . . .

Q. Were you embarrassed to talk about this incident in front of the other jurors?

. . . .

A. No, I wasn't. Like I said, you know, it happened so long ago, you know, it just slipped my memory, that's all. You know, I wasn't trying to hide nothing 'cause I didn't have anything to hide, you know. If it would've came to my mind, I would've told them, you know. But like I said,

this happened seven or eight years ago, you know.

When defense counsel examined Juror at the hearing, Juror testified that he had answered all of the questions on *voir dire* truthfully and that no question had prompted him to recall the incident at that time. Furthermore, he was unaware that "suit papers" had been filed, that a judgment had been rendered against him, or that there had been an attempt to garnish his wages arising out of this incident. Finally, he reiterated that had he recalled the incident, he would have brought it to the attention of the court during *voir dire*.

█ We find the questions posed by Parents' counsel during *voir dire*, while circuitous, were directed at eliciting the type of information that was not disclosed by Juror. We, therefore find that the questions were clear. After we have determined that the questions were clear, we next must decide whether the nondisclosure was intentional or unintentional. *Keltner*, 42 S.W.3d at 723. In its order denying Parents' motion for new trial, the trial court determined that Juror's failure to disclose this judgment was unintentional.

## B. Was Juror's Failure to Disclose Intentional or Unintentional?

█ We review a determination of intentional or unintentional nondisclosure for abuse of judicial discretion. *Moore*, 87 S.W.3d at 291. "Intentional nondisclosure occurs: (1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and (2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that the juror's purported forgetfulness is unreasonable." *Id.* In Missouri, a finding of intentional nondisclo-

sure is commensurate with a *per se* rule mandating a new trial. *Id.*

█ Unintentional nondisclosure exists where the experience is insignificant, remote in time, or when the venireperson reasonably misunderstands the question. *Id.* If the trial court finds the nondisclosure was unintentional, a new trial is not warranted unless the party seeking it proves prejudice that may have influenced the verdict. *Id.* If the information withheld does not bear on the case or on the prospective juror's ability to fairly evaluate the evidence, there can be no prejudice. *Id.*

In its order denying Parents' motion for new trial, the trial court found that:

> [Juror's] testimony, that he did not recall the incident at the time of voir dire, was credible. Here the accident occurred in 1994, approximately seven to eight years before jury selection. [Juror] testified that he remembered the question but that he had forgotten about the incident because it had been seven or eight years ago, he did not go to court, he heard about it only from the cab company, the last he heard it had been resolved, and he had put it completely out of his mind. While the size of the default judgment entered on October 21, 1998 in the lawsuit arising from the accident with [Juror's] cab was large, [Juror] testified that he had never received the summons and did not know about the default judgment.... He testified that he was unaware of any attempts to garnish his wages arising from this incident but that his wages had been garnished for child support. Plaintiff submitted the affidavit of counsel for the party injured by the cab which states, inter alia, that he has continued to attempt to collect on this judgment and has executed writs of execu-

tion and garnishment. However, this matter was not developed at the hearing and the Court heard nothing at the hearing suggesting that [Juror] recalled the incident during voir dire or was aware of any garnishment resulting from this incident. The Court does not believe that in the case before it, [Juror] made a conscious decision to determine his own qualifications and not disclose the incident.

The record supports the trial court's findings. Juror testified that the incident in question occurred seven years before jury selection began in the present case. Juror recalled receiving a letter and speaking to the cab company and its attorney regarding this incident. He did not, however, hire or speak to his own attorney, file an answer to the petition, or attend any court hearings. He testified at the hearing that he received no notice of the filing of the petition, the entry of judgment, or the attempts at collection. After speaking with the cab company about a year after the incident, Juror believed that "it was all cleared up" and erased the event from his mind. Juror stated that he was not trying to hide anything, that he had answered all questions in *voir dire* truthfully, that no question prompted him to recall the incident, and that if he had recalled what happened, he would have disclosed it during *voir dire*.

■ "If the juror's knowledge of his lawsuit is the same as his *voir dire* answer, 'he has disclosed everything that the *voir dire* question requires and no nondisclosure of any kind occurred.'" *Heinen v. Healthline Mgmt., Inc.*, 982 S.W.2d 244, 248 (Mo. banc 1998) (*quoting Wingate by Carlisle v. Lester E. Cox Med. Ctr.*, 853 S.W.2d 912, 916–17 (Mo. banc 1993)). In *Heinen*, the supreme court found that because the juror did not know of the lawsuit during *voir dire*, his silence to the defen-

dant's question was complete disclosure. *Id.*

■ Here, Juror testified that he knew of neither the suit nor the substantial judgment entered against him in default. The trial court specifically found that Juror was a credible witness. Because the trial court is in the best position to assess the credibility of witnesses, we will not disturb a credibility determination on appeal. *See Hoffman v. Rotskoff*, 715 S.W.2d 538, 543 (Mo.App.1986). Since Juror did not know of the lawsuit or judgment during *voir dire*, his silence constituted complete disclosure. If any nondisclosure occurred, however, we find it was unintentional rather than intentional.

## C. Were Parents Prejudiced?

■ In a case of unintentional nondisclosure, the relevant inquiry is whether Juror's presence influenced the verdict so as to prejudice Parents. *Redfield v. Beverly Health & Rehab. Servs., Inc.*, 42 S.W.3d 703, 709 (Mo.App.2001). One of the factors we consider is the materiality and relevance of the undisclosed incident to the matter being tried. *Id.* "As the similarity between the undisclosed experience and the case at hand increases, so does the inference of bias and prejudice, the impairment of counsel's ability to make informed peremptory challenges, and the incredulity of the juror's proposed forgetfulness." *Id.*

The undisclosed experience here involved a default judgment arising out of an auto accident not involving Juror, but rather an auto he leased. The case at hand was a medical malpractice action involving the alleged sterilization of an infant. We find a great dissimilarity between the undisclosed experience and the case at hand. Since Juror was unaware at the time of *voir dire* of the lawsuit filed against him or

the default judgment, we find this information did not affect his ability to fairly evaluate the evidence. Point three is denied.

In conclusion, we find the trial court did not abuse its discretion in refusing to invoke "the rule" excluding Defendants' expert from the courtroom or in disallowing the admission into evidence of the second letter written by Parents' expert. Moreover, the trial court did not err in denying Parents' motion for new trial on the basis of juror misconduct during *voir dire*. The judgment of the trial court is affirmed.

CLIFFORD H. AHRENS, J., and BOOKER T. SHAW, J., concur.