Wallace SHIELDS and Deborah
Shields, Plaintiffs–
Appellants,

v.

FREIGHTLINER OF JOPLIN, INC.,
Defendant–Respondent.

No. SD 29515.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 28, 2011.

Roger A. Johnson, Joplin, MO, for Appellant.

Bernard T. Schmitt, Kansas City, MO, for Respondent.

JEFFREY W. BATES, Presiding Judge.

Wallace and Deborah Shields (the Shields) appeal from the denial of their motion for new trial following a jury verdict in favor of defendant Freightliner of Joplin, Inc. (Freightliner). The Shields argue that they are entitled to a new trial due to intentional nondisclosure by juror Russell Allgood (Allgood) during voir dire. We affirm.

## I. Factual and Procedural Background

The Shields filed suit against Freightliner to recover damages for personal injuries they suffered when their recreational vehicle ran off the road. The petition alleged that the crash resulted from Freightliner's negligent failure to replace a defective part in the vehicle's steering mechanism.

The case was tried to a jury in August 2008. Allgood was a member of the venire. The Shields' attorney, Scott Vorhees (Vorhees), questioned the panel first. One of his questions was:

Let me ask you about some of the potential witnesses, some of the people you may hear from in this case. Some of them may work at Freightliner, so I want to ask you a series of names and if anybody know[s] any of these people or recognizes them, please raise your hand.... How about ... Kevin Loudermilk?

Allgood did not respond.

Later, Vorhees asked: "Has anybody ever been accused of doing something that they did not do?" Venireperson Heimberg raised his hand. Vorhees did not ask any questions about the underlying facts of the event. Instead, he wanted to know how Heimberg felt when he was wrongly accused. Vorhees then said:

Sometimes people assume that you've done something that you didn't do and it turns out that you actually did it, or vice versa? Who else in the back right has had an experience where somebody else has said I think you did X, but the truth was you didn't really? Anybody had that experience?

Venireperson White responded by stating: "It's a personal issue that I'd rather not go into." Vorhees asked no further questions about that incident and moved on to Venireperson Christopher, who said: "Mine is personal too." Vorhees responded by saying: "Okay. Yeah, I don't want to pry too deeply into personal issues." Venireperson Kennedy responded that he had been accused of doing something he didn't do on a construction job in another country. Once again, Vorhees asked no further questions about the details of the incident. He only wanted to know how Kennedy felt about the incident. Allgood did not respond to Vorhees' questions on this topic.

Vorhees also asked: "Has anybody been a Defendant, been sued in any type of lawsuit?" Venireperson Williams responded that he had been sued for credit card debt. Thereafter, Vorhees asked several more questions inquiring whether anyone had "been sued" or had been involved as a defendant in a lawsuit. Allgood did not respond to these questions.

Early in the voir dire, venireperson Goettel's response to a question included a statement that he was a mechanic. Vorhees later asked a series of questions relating to the topic of mechanical training:

Let me go back to what got me started on this. Mr. Goettel, you told us you were a mechanic?

BY VENIREMAN GOETTEL: Yes.

BY MR. VORHEES: Who else besides Mr. Goettel has any training in mechanics, automotive mechanics, at all? Anybody else? Any kind of training in mechanics at all? Mr. Goettel, what is your training in mechanics? I know you used to work for Freightliner of Joplin?

BY VENIREMAN GOETTEL: I was a mechanic in the Army. I had training on diesels, training on cars, training on motorcycles. Everything but boats and aircraft.

BY MR. VORHEES: And you currently work for Kenworth?

BY VENIREMAN GOETTEL: Yes, sir, for 9 years, 8 months.

BY MR. VORHEES: Anybody else have any kind of training, even if it's not formal training like Mr. Goettel, they don't do it for a living, but you know, I, at home, kind of do my own mechanic work on my motorcycle, for example? Anybody have any kind of that at home I change my tires, change the oil, that kind of stuff?

Venireperson Newton responded. Vorhees wanted to know the extent of Venireperson Newton's mechanical abilities. Newton said he was in the collision business, and his duties included doing body and frame repairs, as well as working on steering components. At home, he did all of his own work and never went to a mechanic. He had changed his brakes, done his own alignments and adjusted tie rods.

Vorhees then asked: "Anybody else who does their own type of service work at home, besides Mr. Newton?" Venireperson Baker responded that he did what Newton did, except for alignments, suspensions and steering. The following colloquy then ensued when Vorhees asked:

Who else in that back right panel does their own service work of some kind, even if it's not as much as Mr. Newton does? In the front. Is it Ms. Jennings?

BY VENIREWOMAN JENNINGS: Yes.

BY MR. VORHEES: Tell me what all you do on yours?

BY VENIREWOMAN JENNINGS: I've done my fair share of things like tires and stuff like that. I've also done like taking out transmissions in vans. My husband has an '82 [Camaro] that we're restoring. It's not fun, it's dirty work.

BY MR. VORHEES: Do you all work on your own steering, change components in suspension systems?

BY VENIREWOMAN JENNINGS: He does. I just help him align it.

BY MR. VORHEES: Okay. I'm a pretty good tool handler, I can do that. Is that what you do?

BY VENIREWOMAN JENNINGS: That's what our daughter does.

BY MR. VORHEES: Fair enough. If this case turns out to involve some mechanics and what a steering component is or isn't and any of that, would you be able to listen to the evidence in this case and not go home and talk to your husband about it, because he kind of knows something about it? Is that a yes?

BY VENIREWOMAN JENNINGS: Yes.

BY MR. VORHEES: That's all right. I just want to make sure she's clear. Anybody else that they don't do their own service work personally, but their husband or their spouse or whoever they live with does so you're kind of there with it? Anybody else? Ms. Stanley?

BY VENIREWOMAN STANLEY: My husband has done some work on our vehicles. I know how to change the oil and change spark plugs and wires, but I

don't, it's messy. He does really everything on our vehicles. We don't do our alignments anymore. He used to have an old Taurus that had some alignment issues and he worked on that himself. But I didn't know what he was doing. Also, I don't have formal training in mechanics, but as part of my job I have to read a lot of documents about mechanical repairs and a specialty engines and things like that. So I may have picked up a couple a couple [sic] things there.

BY MR. VORHEES: Okay. You say you may have picked up a couple of things. You may have a little bit more knowledge about some things. Would you still be able to listen to the evidence in this case from the mechanics and the evidence here and decide the case on these facts?

BY VENIREWOMAN STANLEY: Yeah, I'm sure I can do that.

Vorhees then asked: "Anybody else, maybe just because they've been there next to it, picked up some mechanical knowledge or done their own service work that we haven't talked to?" Venireperson Heimberg responded that he worked full-time in a shop and was around mechanics all the time. In response to a subsequent question by Vorhees, Heimberg said that he could identify a tie-rod end and had been with his cousin when he put tie rods on Heimberg's car. The following then occurred:

BY MR. VORHEES: . . . . Who else has some experience because a relative, a friend, or spouse, they do it and I kind of picked up on it, that we haven't already talked to? Anybody else have mechanical training that we didn't already talk about? Yes, sir?

BY VENIREMAN BAUER: I used to do my own brakes and things like that, work on my own lawn mowers and stuff.

BY MR. VORHEES: Are you Mr. Bauer?

BY VENIREMAN BAUER: Yes.

BY MR. VORHEES: What kind of vehicle do you have?

BY VENIREMAN BAUER: I've got a Pontiac Montana and a Chevy pickup and a Trail Blazer.

BY MR. VORHEES: Okay. You do all your own service work at home?

BY VENIREMAN BAUER: Pretty much.

Allgood did not respond to any of the above-referenced questions about mechanical training.

Allgood was seated as a juror by the trial court. The jury returned a verdict in favor of Freightliner. Allgood was one of the jurors who signed the verdict. The court entered judgment on September 2, 2008.

On October 2, 2008, the Shields filed a timely motion for new trial. A transcript of Vorhees' voir dire was attached to the motion and incorporated by reference. The motion asserted that Allgood had intentionally failed to disclose information during voir dire in two respects: (1) he failed to disclose that two orders of protection had been issued against him; and (2) he failed to disclose that he knew or recognized Kevin Loudermilk (Loudermilk). The motion contained no allegation that Allgood had failed to disclose information about any mechanical training.

The trial court conducted an evidentiary hearing on the motion on November 20, 2008. Allgood testified, and the court admitted a number of documents in evidence as well. The evidence presented at the hearing is summarized below.

On May 2, 2007, Allgood's wife filed two pro se petitions seeking orders of protection against Allgood. The first petition,

which sought an ex parte order of child protection, alleged that Allgood knowingly and intentionally inflicted emotional abuse on their child, then 20 months old, by calling him a name because he would not stop crying. Allgood admitted this allegation was true and testified that "people get upset and things are said over heated discussions...." He denied that his comment inflicted any harm on his son. The second petition, which sought an ex parte order of protection for Allgood's wife, alleged that he had harassed his wife by threatening to cause her physical harm. Allgood admitted that "when we have heated discussions there may have been words said ...." Allgood denied that his words had caused any harm to his wife. Both ex parte orders were issued and served upon Allgood. At a hearing on May 16, 2007, Allgood appeared pro se. He chose not to contest either petition and consented to the entry of full orders of protection against himself as the respondent. Allgood testified that:

I didn't understand that an ex parte was a lawsuit. I thought an ex parte was just a court order of protection. I didn't know that she was suing me, you know. To me a lawsuit is kind of like what the Shields went through. Something personal, matter with me and my wife, that's an ex parte. To me that's not a lawsuit, so I didn't consider it to be— you know, it was a personal matter that, you know—I'm not a law person, I'm not a lawyer. To me an ex parte is just a court order to say, hey, you need to stay away from your wife or your son, you know, which is what he was trying to do. To me that's not a lawsuit.

After the full orders of protection were issued, Allgood and his wife resolved their personal issues and got back together.

Allgood's mother lived in a house on Fox Run Lane in Joplin. She and Allgood were the co-owners of that real estate. Allgood's mother decided to sell the house, and she was the main person involved in the sale process. In July 2004, the house was sold to Loudermilk. Allgood did not know Loudermilk and had never heard of him. Allgood did not recall meeting Loudermilk at the closing. He only remembered himself and his mother being present when they executed the deed. Allgood believed that Loudermilk signed his papers at a different time. If Allgood read the deed at the closing, he was not concerned about the buyer's name. Allgood testified that "this just blows me away that [Loudermilk's] name is even on there."

Near the end of the hearing, Allgood was asked about his mechanical training. Freightliner's counsel objected that this alleged nondisclosure issue could not be considered because: (1) it had not been included in the motion for new trial; and (2) counsel was unprepared to address it because he had no notice the issue was going to be raised. The Shields' counsel acknowledged that, prior to the hearing, he had acquired no information suggesting any nondisclosure by Allgood on this topic. The trial court deferred its ruling on the objection. Allgood testified that he had changed the oil in his vehicle, and he had changed a flat tire in the past. He had no schooling or technical training in mechanical matters. What he had learned from doing things was the same general knowledge possessed by everybody else in the world. Allgood understood counsel's voir dire questions to be asking about training. Allgood did not respond because he had none. He was not a mechanic, and he did not consider changing his oil to be doing his own "service work" at home. He understood counsel's voir dire inquiries about training to involve situations where another person had trained Allgood how to do something.

At the conclusion of the hearing, the judge stated that he had listened very closely to Allgood's testimony and viewed his demeanor. The judge noted that Allgood "did not appear to me at any time that he thought he'd been caught in a lie or that he had tried to cover something up. And I have a different view and recollection of some of the evidence I've heard today." With respect to the orders of protection, the court decided there was no intentional nondisclosure because Allgood had not been asked a clear question that called for him to respond. The court also believed Allgood's testimony that he did not understand that an ex parte proceeding was a lawsuit. With respect to Loudermilk, the court decided there was no intentional nondisclosure because the judge was convinced that Allgood did not know or recognize Loudermilk. The court noted that "in this area it is not uncommon for buyers and sellers never to meet either during the course of a transaction where people are sheltered by realtors and buyers and seller's agents and at closing, as was apparently done here, where there were separate closings for the buyer and the seller." With respect to mechanical training, the court stated:

> My recollection of [Allgood's] testimony today was that he understood that [Shields' counsel] was asking not about formal training, but about training in mechanics and he said I haven't had any training as a mechanic, you know. And I believe he testified I haven't had any technical or other training as a mechanic. And so—and we're dealing with somebody who is not a wordsmith. He does not deal in his line of work in precise questions and answers. I think based upon his answers and his demeanor and the record, I think he came in with his knowledge and experience and did the best job he could in answering the questions.

The court determined there had been no intentional nondisclosure by Allgood during voir dire and denied the Shields' motion for new trial. This appeal followed.

## II. Standard of Review

■ Absent an abuse of discretion, an appellate court will not disturb the trial court's ruling on a motion for new trial based upon juror nondisclosure. *Johnson v. McCullough*, 306 S.W.3d 551, 555 (Mo. banc 2010). A trial court abuses its discretion only if its ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Wingate by Carlisle v. Lester E. Cox Medical Center*, 853 S.W.2d 912, 917 (Mo. banc 1993).

■ A venireperson's duty to disclose is triggered only after a clear question has been asked. *Johnson*, 306 S.W.3d at 555. "The question asked during voir dire must clearly and unambiguously trigger the juror's obligation to disclose the information requested." *Id.* Whether the question is sufficiently clear is a threshold question that an appellate court determines de novo from an objective standpoint. *Id.* Silence to an unequivocal question triggers a venireperson's duty to respond if the information is known to the juror. *Saint Louis University v. Geary*, 321 S.W.3d 282, 295 (Mo. banc 2009).

■ If nondisclosure is established, the next step is to determine whether it was intentional or unintentional. *Id.* "This determination is left to the sound discretion of the trial court." *Id.* Intentional nondisclosure occurs when: (1) there is no reasonable inability of the prospective juror to comprehend the information solicited by the question; and (2) the prospective juror actually remembers the

experience, or it was of such significance that his or her purported forgetfulness is unreasonable. *Id.* at 295–96; *Williams By and Through Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987). Examples of unintentional nondisclosure include: (1) a prospective juror forgetting about an experience that was insignificant or remote in time; or (2) a prospective juror reasonably misunderstanding the question posed. *Geary*, 321 S.W.3d at 296. If material information is intentionally withheld, bias and prejudice normally will be presumed. *Id.*; *Johnson*, 306 S.W.3d at 557. If the nondisclosure was unintentional, a new trial is not warranted unless prejudice resulted from the nondisclosure. *Johnson*, 306 S.W.3d at 557. The party seeking a new trial bears the burden of proving prejudice from unintentional nondisclosure. *Geary*, 321 S.W.3d at 296. On appeal, the trial court's findings are given great weight. *Id.*

### III. Discussion and Decision

The Shields present one point on appeal. They contend the trial court abused its discretion in denying the motion for new trial because Allgood intentionally failed to disclose: (1) the sale of his house to Loudermilk; (2) Allgood's involvement in the order of protection proceeding; and (3) his mechanical training. We will address each prong of this point in turn.

#### *Loudermilk*

■ The first prong of the Shields' point deals with Allgood's alleged nondisclosure concerning Loudermilk. During voir dire, Allgood was asked whether he knew or recognized a potential witness named Loudermilk. Reviewed de novo

from an objective standpoint, we conclude that the question was clear. Allgood did not respond to the question. The trial court determined that there was no nondisclosure because Allgood did not know or recognize Loudermilk. We find no abuse of discretion in that ruling.

The trial judge, who had the opportunity to assess Allgood's demeanor during the hearing on the motion for new trial, found him to be credible. The judge made a finding that Allgood "did not appear to me at any time that he thought he'd been caught in a lie or that he had tried to cover something up." The judge also found that Allgood did not know or recognize Loudermilk. That finding is amply supported by the evidence. Allgood's mother is the person who lived in the house that was sold to Loudermilk. It was her decision to sell the house, and she was the main person involved in the sale process. Allgood did not know Loudermilk and had never heard of him. Allgood testified that he did not meet Loudermilk at the closing. He recalled that only he and his mother were present when they executed the warranty deed. If Allgood read the deed at the closing, he was not concerned about the buyer's name. This prong of the Shields' point has no merit and is denied.[1] *See Byers v. Cheng*, 238 S.W.3d 717, 722–23 (Mo.App.2007) (deferring to the trial court's credibility finding that there had been no nondisclosure during voir dire because the juror did not know the plaintiff's counsel).

#### *The Order of Protection Proceeding*

■ The second prong of the Shields' point deals with Allgood's alleged nondis-

---

1. The Shields also argue that they are entitled to a new trial even if Allgood's nondisclosure was unintentional. This argument, which was raised only in the argument section of the Shields' brief, will not be addressed because it was not asserted in the point relied on. *Giles v. Riverside Transport, Inc.*, 266 S.W.3d 290, 298 (Mo.App.2008); *Sexton v. Omaha Prop. & Cas. Ins. Co.*, 231 S.W.3d 844, 846 n. 2 (Mo. App.2007).

closure concerning his involvement in an order of protection proceeding.[2] Because the Shields argue that Allgood failed to answer to different types of questions relating to this topic, we address each type of question separately.

During voir dire, the Shields' counsel asked: "Has anybody ever been accused of doing something that they did not do?" Reviewed de novo from an objective standpoint, we conclude that the question was not clear. In fact, it is difficult to imagine a more vague and ambiguous question. As posed, the question would require a response from a venireperson who had been falsely accused of committing a crime, selling a defective product, having an affair, forgetting an anniversary, cheating on a test in elementary school, eating the last piece of chocolate cake, etc. Moreover, it is abundantly clear from the record before us that the Shields' counsel did not expect venirepersons to answer the question at all if the false accusation involved a personal matter. Two venirepersons declined to answer the question for that reason, and counsel simply dropped the matter without asking any follow-up questions. Based upon the vagueness of the question and counsel's stated lack of interest in personal matters, Allgood was not asked a clear question that triggered an obligation to respond. "The question asked during voir dire must clearly and unambiguously trigger the juror's obligation to disclose the information requested." *Johnson*, 306 S.W.3d at 555.

■ During voir dire, the Shields' counsel also asked if anybody had been "a Defendant, been sued in any type of lawsuit?" One venireperson responded that he had been sued for credit card debt.

Thereafter, counsel asked additional questions inquiring whether anyone had "been sued" or had been involved as a defendant in a lawsuit. Reviewed de novo from an objective standpoint, we conclude that these questions were clear. Allgood did not respond. The trial court determined that Allgood's nondisclosure was unintentional. We find no abuse of discretion in that ruling.

■ As *Geary* recognizes, unintentional nondisclosure exists when a venireperson reasonably misunderstands the question posed. *Saint Louis University v. Geary*, 321 S.W.3d 282, 296 (Mo. banc 2009). The petitions and orders of protection served upon Allgood all referred to him as a respondent, rather than a defendant. Allgood testified that:

> I didn't understand that an ex parte was a lawsuit. I thought an ex parte was just a court order of protection. I didn't know that she was suing me, you know. To me a lawsuit is kind of like what the Shields went through. Something personal, matter with me and my wife, that's an ex parte. To me that's not a lawsuit, so I didn't consider it to be— you know, it was a personal matter that, you know—I'm not a law person, I'm not a lawyer. To me an ex parte is just a court order to say, hey, you need to stay away from your wife or your son, you know, which is what he was trying to do. To me that's not a lawsuit.

The trial court found this testimony to be credible. On appeal, that finding is entitled to great weight. *Id.* This prong of the Shields' point has no merit and is denied. *See Byers*, 238 S.W.3d at 723–25 (deferring to the trial court's credibility determina-

---

2. Under the case law in effect at the time of trial, the Shields' claim that Allgood intentionally failed to disclose his prior litigation history was timely raised. *See Johnson v.*

*McCullough*, 306 S.W.3d 551, 558 (Mo. banc 2010); *Overlap, Inc. v. A.G. Edwards & Sons, Inc.*, 318 S.W.3d 219, 227 (Mo.App.2010).

tion that a juror unintentionally failed to disclose that he had been a defendant in a lawsuit; the court did not abuse its discretion in finding that the juror reasonably failed to understand that a garnishment proceeding was a lawsuit); *Toppins v. Schuermann,* 983 S.W.2d 582, 589–90 (Mo. App.1998) (holding that a juror's failure to disclose an employer-initiated worker's compensation claim was unintentional because the juror reasonably misunderstood a question asking whether the juror or any member of her family had made any kind of claim for personal injury).

### *Mechanical Training*

■■■■ The third prong of the Shields' point deals with Allgood's alleged nondisclosure concerning mechanical training. Freightliner argues that this issue is not preserved for appellate review. We agree.

Rule 78.07 states that "[a]llegations of error based on matters occurring or becoming known after final submission to the court or jury shall be stated specifically." [3] Before the Shields' motion for new trial was filed, their counsel had obtained a transcript of the plaintiffs' voir dire questions. Therefore, the Shields had a complete record of every question they asked during voir dire. The Shields' motion for new trial only alleged intentional nondisclosure by Allgood on two topics: (1) the order of protection proceeding; and (2) Loudermilk. The motion contained no allegation of intentional nondisclosure by Allgood about any mechanical training. That issue was first raised by the Shields at the hearing on the motion for new trial. During the hearing, the Shields' counsel conceded that he had no prior information suggesting Allgood had failed to disclose any information about mechanical training. Freightliner's counsel also advised the trial

court that this issue was not preserved for review.

In *Williams By and Through Wilford v. Barnes Hosp.,* 736 S.W.2d 33 (Mo. banc 1987), the defendant hospital filed a motion for new trial after the jury returned a verdict in favor of the plaintiff. The motion alleged that one or more venirepersons had failed to truthfully answer voir dire questions about litigation, prior claims and involvement with the hospital. *Id.* at 34. The trial court denied the motion, and the hospital appealed. Plaintiff argued that the hospital had failed to preserve the issue of juror misconduct by failing to state the allegations of misconduct with specificity in the motion for new trial. *Id.* at 36. Relying upon Rule 78.07, the Supreme Court noted that general allegations of error not based upon specific objections or requests during trial are insufficient to preserve allegations of error for review. The Court held that, although the names of the jurors were not included in the hospital's motion, stating the subject matter of the unanswered questions was sufficient to preserve the issue for review. *Id.*

In *Lohsandt v. Burke,* 772 S.W.2d 759 (Mo.App.1989), the plaintiff filed a motion for new trial after the jury returned a verdict in favor of the defendant. Plaintiff's motion alleged that members of the jury had failed to answer voir dire inquiries to plaintiff's prejudice. *Id.* at 760. On appeal, plaintiff argued that a juror had concealed information about her religious beliefs and injuries to her mother-in-law. Relying upon Rule 78.07 and *Williams,* the western district of this Court held that the plaintiff failed to preserve that issue for review because "the subject matter of the questions on voir dire, that members of the jury were alleged to have failed to answer, were not

---

**3.** All references to rules are to Missouri Court Rules (2009).

set out in appellant's motion for new trial." *Lohsandt,* 772 S.W.2d at 760.

In *Alexander v. F.W. Woolworth Co.,* 788 S.W.2d 763 (Mo.App.1990), the plaintiff filed a motion for new trial after the jury returned a verdict in favor of defendant.[4] Plaintiff's motion alleged that one juror failed to disclose information about prior litigation during voir dire. *Id.* at 764. During the hearing on the motion, the juror testified that she had been sued by a credit card company. The juror also volunteered that she and her husband had been injured 15 years earlier in an automobile collision and had signed some papers with respect to that claim. The eastern district of this Court held that the juror's failure to mention the automobile accident claim had not been preserved for appellate review because it was not mentioned in plaintiff's motion for new trial. *Id.* at 768 n. 2.

The Shields' motion for new trial contained no allegation that Allgood failed to disclose any mechanical training. Therefore, that allegation of juror nondisclosure is not preserved for appellate review. *Lohsandt,* 772 S.W.2d at 760. The fact that the issue was raised at the hearing on the new trial motion does not change our analysis. *Alexander,* 788 S.W.2d at 768 n. 2. Because this aspect of the Shields' point is not preserved for review, we decline to consider it. *See Copeland v. Compton,* 914 S.W.2d 378, 383 (Mo.App.1996); *Lohsandt,* 772 S.W.2d at 760. The Shields have not

requested plain error review, and we decline to do so sua sponte. *See George v. Howard Constr. Co.,* 604 S.W.2d 685, 696 (Mo.App.1980).[5]

In conclusion, the trial court did not abuse its discretion in denying the Shields' request for relief based upon the two allegations of nondisclosure contained in their motion for new trial. The judgment of the trial court is affirmed.

BARNEY and BURRELL, JJ., concur.

---

**4.** *Alexander* was overruled on other grounds by *Brines By and Through Harlan v. Cibis,* 882 S.W.2d 138, 140 (Mo. banc 1994).

**5.** Assuming this aspect of the point had been preserved, the trial court's ruling would not have been an abuse of discretion. Allgood testified that he understood these questions to be asking whether he had mechanical training. He did not respond because he had no schooling or technical training in mechanical matters. He had only changed the oil in his

vehicle and changed a flat tire in the past. He was not a mechanic, and he did not consider changing his oil to be doing his own "service work" at home. He understood counsel's voir dire inquiries about training to involve situations where another person had trained Allgood how to do something. We must defer to the trial court's finding that Allgood's testimony was credible. *See Saint Louis University v. Geary,* 321 S.W.3d 282, 296 (Mo. banc 2009).