Felicia WHITTED, Carla Whitted, and Shanota Cunningham, Respondents,

v.

HEALTHLINE MANAGEMENT, INC., and John Beck, M.D., Appellants.

No. ED 80581.

Missouri Court of Appeals, Eastern District, Division Three.

Oct. 29, 2002.

Robert T. Haar, Susan E. Bindler, Kim Roger Luther, St. Louis, MO, for appellants.

David N. Damick, John C. Kress, St. Louis, MO, for respondents.

MARY R. RUSSELL, Presiding Judge.

Healthline Management, Inc. ("Company") and John Beck, M.D. ("Doctor"), appeal the grant of a new trial in a negligence action against them for the death of Cornelius Whitted ("Patient"). Patient's daughters, Felicia Whitted, Carla Whitted, and Shanota Cunningham ("Daughters"), moved for a new trial after a jury rendered a verdict for Doctor. The trial court granted Daughters' motion on the ground that, following his deposition and before trial, Company and Doctor's sole expert, Dr. Philip Ludbrook ("Expert"), changed his testimony regarding the medical issues in the case without notice to Daughters.

We affirm in part and reverse and remand in part.

Patient fell off a ladder while cleaning out a gutter at his parents' house at approximately 5 p.m. on August 31, 1997. Approximately two and one-half hours later, Patient fainted and his family called an ambulance. When he arrived in the emergency room, Patient told the staff that when he fell, he had struck his right side, hitting his chest or abdomen, and he complained of pain in the right side of his chest, his right wrist, and his right hip. Patient had a cervical collar on his neck and also said he was nauseated. Patient's vital signs were taken, and he received cervical spine and chest x-rays, which did not indicate any fractures. Doctor then ordered x-rays of Patient's wrists and ribs.

After he had been in the emergency room for approximately half an hour and Doctor had conducted x-rays, examined him, and inquired about his medical history, Patient told Doctor that he felt a dull pain on the left side of his chest that had begun before he fell from the ladder. Doctor requested an electrocardiogram, which was performed at 9:18 p.m. Within minutes after the test, Patient suffered a heart attack and died.

Daughters brought suit against Company, Doctor, and Normandy Community Hospital Management ("Hospital") claiming that all three were liable for the negligent treatment of Patient in the emergency room.[1] Daughters alleged several negligent acts against all three, the crux of which was that Doctor committed negligence in that he failed to exercise the degree of knowledge, skill, and care as an ordinarily careful, qualified, and competent physician would have provided in that circumstance. Daughters claimed that Hospital and Company were liable as a result of Doctor's actions because he was Hospital's and Company's agent or employee.

Hospital reached a settlement with Daughters that was approved by the court on the last day of the trial. Daughters did not submit a jury instruction as to Company, but they did submit their claim against Doctor to the jury, which returned a verdict in favor of Doctor.

Daughters subsequently moved for a new trial on several grounds, and the trial court granted their motion on the basis that Expert's testimony changed after his deposition and before trial without notice to them. The trial court's order granted a new trial as to Company and Doctor. They appeal that judgment.

Company and Doctor (collectively "Healthcare Providers") assert three points of error on appeal. In their first two points, they argue that the trial court erred in granting a new trial because Expert did not change his testimony and because any claim of error was waived by Daughters in that they failed to object to Expert's testimony at trial. Healthcare Providers argue in their third point that the trial court abused its discretion in granting a new trial as to Company because Daughters had abandoned their claim against it by failing to submit it to the jury.

When deciding whether to grant a new trial, a trial court has broad discretion. *Duckett v. Troester*, 996 S.W.2d 641, 646 (Mo.App.1999). A trial court may, on a motion for new trial, reconsider its discretionary rulings and order a new trial if it believes its discretion was not wisely exercised and the losing party was prejudiced as a result. *Cooper v. Ketcherside*,

---

1. Company's involvement in this action stems from its contract with Hospital to provide staff members, including Doctor, for Hospital's emergency room.

907 S.W.2d 259, 260 (Mo.App.1995). "The admissibility of evidence, including the testimony of an expert, is a matter within the discretion of the trial court." *Id.* We are, therefore, limited to evaluating on review whether the trial court abused its discretion in finding prejudice. *Id.*

A ruling constitutes an abuse of discretion when it is so arbitrary and unreasonable as to shock one's sense of justice and to indicate a lack of careful consideration. *Duckett,* 996 S.W.2d at 646. When reasonable persons could differ as to the propriety of the trial court's ruling, however, it cannot be said that the trial court abused its discretion. *Id.* Furthermore, we apply a rule of greater liberality when reviewing a trial court's grant, as opposed to its denial, of a new trial. *Cooper,* 907 S.W.2d at 260.

In their first point, Healthcare Providers claim the trial court erred in granting Daughters' motion for a new trial on the ground that Expert changed his testimony after his deposition and before trial. Healthcare Providers assert that the trial court's ruling is not substantially supported by the record because (1) the trial court's order violated Rule 78.03 as it did not articulate the nature of the changed testimony, (2) Expert did not change his testimony, and (3) Expert's testimony was not prejudicial as it was cumulative to testimony introduced by Daughters on the same issue and it did not express new opinions but merely served to explain his deposition testimony.

We begin our analysis by addressing Healthcare Providers' allegation that the trial court's order lacks specificity in violation of Rule 78.03, which requires every order for a new trial to "specify of record the ground or grounds on which said new trial is granted." The failure of a

trial court to specify the ground upon which a new trial is granted creates a presumption of error, and the party in whose favor the new trial was granted bears the burden of supporting the trial court's ruling. *Blue Cross Health Servs., Inc. v. Sauer,* 800 S.W.2d 72, 75 (Mo.App. 1990). If the rule were otherwise, the party appealing from the grant of a new trial would be required to show the absence of merit in each claim of error set forth in the proponent's motion for a new trial. *Id.* Instead, when a new trial is granted without specific grounds cited, Rule 84.05(c)[2] allows the party opposing the new trial to shift the burden to the proponent to support the order. *Sauer,* 800 S.W.2d at 75.

The order granting Daughters a new trial states:

> The new trial is granted on the grounds that [Healthcare Providers'] sole expert changed his testimony regarding medical issues in this case after his deposition and prior to trial without notice to [Daughters]. The Court has read the deposition testimony of [Expert] and reviewed the trial testimony of [Expert]. Based upon that review, the Court finds that there was a material change in testimony at trial. In addition, the Court finds that this change in testimony was prejudicial to [Daughters].

Daughters' motion for a new trial includes six paragraphs, each of which asserts a different claim as to why they are entitled to a new trial. Only the first paragraph alleges that a new trial should be awarded on the ground that Expert's trial and deposition testimony differed without notice to Daughters, whereas the other five paragraphs contain disparate arguments. The trial court's order was accompanied by more than a scant explana-

---

**2.** *Sauer* discusses Rule 84.05(b), which is the     same as the present Rule 84.05(c).

tion of its reasoning, and it consisted of more than merely an attempt to indirectly incorporate Daughters' motion for a new trial. *Cf. Bishop v. Carper*, 81 S.W.3d 616, 619 (Mo.App.2002) (reversing new trial award that undisputedly failed to meet specificity requirement and stated only "Court sustains Motion for New Trial"); *Rodman v. Schrimpf*, 18 S.W.3d 570, 571–72, 575 (Mo.App.2000) (reversing order for new trial when only enumerated reason was "for good cause shown" and proponents failed to overcome presumption or error); *Gamble v. Bost*, 901 S.W.2d 182, 184–85, 188 (Mo.App.1995) (finding proponent met her burden of supporting order for new trial granted "on the basis of instruction No. 9" without explanation as to which of her three arguments pertaining to instruction was basis for order); *McDowell v. Kawasaki Motors Corp. USA*, 799 S.W.2d 854, 859 (Mo.App.1990) (criticizing new trial order in which trial court did not state reasons for its order; order merely referred to paragraphs of proponent's motion and adopted "shotgun" assignments of error). In addition, Daughters' memorandum in support of their motion for a new trial cited the specific passages of Expert's trial testimony they believed to be inconsistent.

■ We find that the trial court's order sufficiently enunciated the grounds upon which the order was based. Furthermore, if Healthcare Providers genuinely were unaware of the basis of the trial court's order, they could have requested that Daughters file the first brief on appeal. *See Sauer*, 800 S.W.2d at 75; Rule 84.05(c).

■ We next address Healthcare Providers' argument that Expert did not change his testimony. When an expert who has been deposed later changes his or her opinion before trial or bases it on new or different facts from those revealed at the deposition, the party intending to use the expert's testimony has the duty to disclose the new information to the opposing party, effectively updating the responses made during the deposition. *Green v. Fleishman*, 882 S.W.2d 219, 222 (Mo.App. 1994). Allowing experts to change their opinions after deposition and before trial without notice to their adversaries would frustrate the purpose of our discovery rules because it would prevent them from eliminating, as far as possible, concealment and surprise in litigation. *See Bailey v. Norfolk & W. Ry. Co.*, 942 S.W.2d 404, 415 (Mo.App.1997). "A trial court is vested with broad discretion as to its choice of a course of action during trial when evidence has not been disclosed in response to appropriate discovery," and it is within the trial court's discretion whether to reject such evidence or impose other appropriate sanctions. *Green*, 882 S.W.2d at 222.

In the instant case, Daughters' brief sets out several incidents where Expert's testimony at trial differed from what he said during his deposition. Without addressing every allegation of inconsistency, we instead address what we believe to be the most crucial discrepancy between his deposition and trial testimony.

During his deposition, Expert answered the following questions accordingly:

[Daughters' attorney:] Now, in fact, [Patient] died as a result of this dissociation that you are talking about, this failure of the heart to deliver blood because it wasn't coordinated; is that right?

[Expert:] Well, it's hard to say exactly why he died because we don't really have a great deal of information, but he went from—at some time went from this EKG pattern into one of an isolated ventricular response. And I don't know how quickly these were obtained after the arrest, but these are—you can call them beats. They're not even coordi-

nated contractions. There's a lot of them stimulated by the external compression.

But he went from a complete heart block to some sort of rhythm disorganization. And whether that's got to do with the electrical situation or whether it's got to do with the pump function, and therefore pumping less, is only conjectural.

. . . .

[Daughters' attorney:] He didn't die of a complete heart block. He died of what?

[Expert:] Well, we don't really know. Presumably he had a malignant arrhythmia. We don't know that at all.

At trial, however, Expert testified as follows:

[Healthcare Providers' attorney:] Explain for me how the damage that was done here then relates to this fibrillation that eventually develops?

[Expert:] Yes. You're going to get sick of me saying this. The right coronary artery coming along this side and the underside of the heart is an inferior lower surface heart attack. That right coronary artery also supplies the AV node. When that occurs, this is such a big piece of tissue, it's so well supplied that it doesn't die. It just temporarily shuts down, and that comes good. When it shuts down, it's producing a condition called partial or complete heart block.

When that occurs, the atrial, upper chambers and ventricles beat separately. They no longer fully coordinate. Its actions are okay, but not very good. You lose about 25, 30 percent of your pumping force when that happens. So it's a common enough thing that occurs with an inferior infarct. Usually the patient sails through it, gets better. They survive.

In certain instances, other things take place. To explain that, let me just remind you of the lumps of tissue which are killed i.e., necrosis. When all that tissue gets killed, it releases a lot of different chemicals. Very different chemicals are released from the body. Those chemicals can upset the electrical activation of the heart. When that happens, ordinary rhythm or heart block rhythm or whatever it is can be converted into ventricular fibrillation. It's an electrical instability that's caused by the abnormality in the chemistry of that particular area of dying heart muscle. So it's a piece of pathology, something wrong that's specific to heart muscle that doesn't occur in other organs. That's why heart attacks can be dangerous.

. . . .

[Healthcare Providers' attorney:] Explain to the jury, if you would, the muscle side and the electrical side and what, if any, effect a pacemaker would have on saving this man's life?

[Expert:] We have two separate functions of the heart. We have the muscle function, and that's dependent upon that artery being open and blood pumped through it to supply the squeezing muscle. That's part one. The other thing the heart does is it has a heart rate with an EKG that we can make diagnoses from. Really there are two very, very different things.

A heart attack, as we said, is a destruction of, death of a piece of muscle. It's the tissue death. Pathologists would say it's necrosis. The cells lose their ability to beat. As those cells die, they release all sorts of noxious chemicals. Those chemicals make the heartbeat irregular. That's just their propensity. That's what happens. The chemicals

are what produces the bad heart rhythm, ventricular fibrillation. Ventricular fibrillation is not the slow heart rate. It is not heart block. It's a loss of contraction and a loss of heartbeat, because of the irritation produced by all of those chemicals which are in turn released when the cell, the muscle dies. So that's one side.

The other side is the electrical side. We have cardiologists now who do nothing but the electrical. They're called electrophysiologists. We have that electrical system which includes our own pacemaker and wires going down to the heart. If you can—if you do produce some change in the electrical wiring— we've been through this EKG. You can produce this condition of heart block as an electrical phenomenon, separation of the upper chambers and the lower chambers in beating function. It's purely an electrical phenomenon. It doesn't have anything to do with the physiology that's produced by the blocked artery and the chemicals. We can't use an external pacemaker in such situations. It only works about five or six out of 10 patients.

. . . .

[Healthcare Providers' attorney:] It's the tissue damage that ultimately leads to the death, the defib?

[Expert:] Exactly.

[Healthcare Providers' attorney:] As a result of the chemical?

[Expert:] Release of the chemicals.

. . . .

[Daughters' attorney:] I need to ask this, because it's a very serious question for me. You're saying now that these necrotic cells, which nobody can find but you know are there, release some chemical and that's what killed [Patient]; is that right?

[Expert:] Correct.

■■■ Expert's deposition and trial testimony clearly contradict each other. At his deposition, Expert was unable to pinpoint whether Patient's death occurred as a result of an electrical or a pump problem in his heart. In contrast, at trial, Expert explicitly stated that Patient's death was caused by cell necrosis.

The essence of Daughters' case was that Healthcare Providers failed to meet the requisite standard of care and that earlier detection of Patient's heart problem and providing Patient with a pacemaker could have saved his life. As Expert's deposition testimony as to what caused Patient's death differed from his trial testimony, we cannot find that the trial court abused its discretion in awarding a new trial on the basis of his inconsistent testimony.

In the remainder of their first point relied on, Healthcare Providers attempt to argue that Expert's trial testimony merely explained and supported his deposition testimony. In our preceding discussion of whether Expert's trial and deposition testimony differed, we have already noted that his trial testimony expressed an entirely different set of opinions than those offered at his deposition. As such, we disagree with Healthcare Providers' contention that Experts' trial testimony merely reiterated and expounded upon his deposition testimony.

■■■ Healthcare Providers also argue that Expert's trial testimony was cumulative of testimony from Daughters' experts that had already been presented before Expert testified. Upon a careful review of the record, we note that some portions of all three experts' testimony indeed include similar statements. However, as to the statements that formed the basis for Daughters' motion for a new trial, we find that Expert's trial testimony was neither

cumulative nor did it merely expound upon his deposition testimony.

In their motion for a new trial, Daughters specifically complained about Expert's inconsistent testimony with respect to Patient's cause of death. At his deposition, Expert said he could not identify the exact cause of Patient's death, whereas at trial, he explained about cell necrosis and how the chemicals released from dying cells caused Patient's death.

A review of the testimony proffered at trial by Daughters' experts indicates that their testimony of Patient's heart attack differs significantly from Expert's discussion of cell necrosis as the cause of his death. Expert testified that the death of cells in Patient's heart released noxious chemicals that caused Patient's irregular heartbeat and, eventually, his death.

The only testimony proffered by Daughters' experts that was remotely similar to Expert's statements came from Dr. Frank Baker. Dr. Baker testified that the postmortem exam indicated that there was no evidence the heart muscle had died yet; it indicated the muscle was in the process of dying. He said that Patient died from a little clot that rendered a tiny part of his heart abnormal, and the cells that died as a result of the clot were the cells responsible for controlling the heartbeat. Without those cells to coordinate the heart's beat, he said, each heart cell began to contract independently, the heart quit pumping, and Patient died.

Dr. Baker's testimony indicated that Patient's death was a result of a blood clot killing his heart's pacemaking cells. In contrast, Expert opined at trial that Patient's death was effected by dying cells in his heart that emitted noxious chemicals, and those chemicals subsequently caused the heart to quit beating. These two opinions are similar only in that they both involve dying cells in the heart. However, they point to different causes for Patient's death.

Based on the foregoing, we find that Expert's trial testimony was not merely cumulative of the opinions offered by Daughters' experts. Healthcare Providers' first point is denied.

In their second point, Healthcare Providers allege that the trial court abused its discretion in granting Daughters a new trial on the ground that Expert's deposition and trial testimony differed and no advance notice was given to Daughters. They argue that Daughters failed to object at trial to Expert's testimony and thereby waived any objection to it.

In our review of the transcript, we note that Daughters' counsel specifically objected to the change in Expert's opinion at a sidebar during cross-examination. The trial court suggested at that time that the appropriate remedy for Daughters was for counsel to cross-examine Expert as to the discrepancy in his testimony. The objections lodged at the sidebar were reiterated by Daughters in their motion for a new trial.

■ We find that the trial court was within its power to reconsider its discretionary rulings as to the admissibility of evidence, including expert testimony, and order a new trial if it believed its discretion was not properly exercised at Daughters' expense during the trial. *See Cooper,* 907 S.W.2d at 260. Furthermore, even if they had failed to object, as Healthcare Providers claim, "the trial court has discretion to grant a new trial when it finds that error occurred, whether or not there was a timely objection." *MFA Oil Co. v. Robertson–Williams Transp., Inc.,* 18 S.W.3d 437, 440 (Mo.App.2000).

■ Healthcare Providers further maintain that Daughters waived any objec-

tion to Expert's testimony because they "gambl[ed] on [their] chances for a favorable judgment" by letting the case go to the jury before moving for a new trial. In *MFA Oil Co.*, however, the Western District affirmed a new trial granted to an oil company for instructional error even though the oil company failed to make specific objections before the jury began deliberating and the jurors returned with a verdict favorable to the oil company's opponent. *Id.* at 439–40. The appellate court admitted that the trial court might have regarded the error as unpreserved, but it found that the grant of a new trial was within the trial court's discretion whether or not an objection was made. *Id.*

We find that the error in the instant case was preserved by Daughters' trial counsel. Furthermore, even if counsel had not objected, the trial court still would have been within its discretion to award a new trial based on the change of Expert's testimony, regardless of whether the new trial order was granted before or after the jury's verdict was rendered. Healthcare Providers' second point is denied.

■■■ In their final point, Healthcare Providers allege that the trial court abused its discretion in granting a new trial as to Company. They claim that Daughters abandoned their claim against Company at trial when they elected not to submit their claim against it to the jury. In Daughters' brief, they argue that Healthcare Providers did not preserve this issue for appeal, but they admit that they failed to submit an instruction as to Company.

The following discussion occurred in chambers before the jury retired for deliberations:

The Court: Let's do these jury instructions.

[Healthcare Providers' attorney]: My motion for directed verdict at the close of all the evidence. Your Honor, it's the defendant's position—formally on the record has [Company] been dismissed?

[Daughters' attorney]: I make the motion on their behalf. When the instructions—we haven't submitted an instruction on them. I haven't dismissed them yet. I'm not submitting an instruction on them. Essentially they're about to be.

The record does not indicate a dismissal with or without prejudice at any time. Daughters admittedly only submitted a jury instruction as to Doctor, however, and Healthcare Providers allege that decision constitutes a waiver of Daughters' claim against Company.

■■■ For purposes of appeal, there is no dispute that a failure to submit an instruction against a defendant waives any point of error the plaintiff may have regarding that claim against the defendant. *See Turner v. Fuqua Homes, Inc.*, 742 S.W.2d 603, 614–15 (Mo.App.1987); *Farmers & Merchants Ins. Co. v. Cologna*, 736 S.W.2d 559 (Mo.App.1987); *Young v. Davis*, 726 S.W.2d 836, 839 (Mo.App.1987); *Keller v. Int'l Harvester Corp.*, 648 S.W.2d 584, 590 (Mo.App.1983). The opposite of this statement also holds true: failure to submit an instruction as to an affirmative defense constitutes a waiver of that defense. *See Lomax v. Sewell*, 1 S.W.3d 548, 552–53 (Mo.App.1999) (failure to submit an instruction for running of applicable statute of limitations waives that affirmative defense). Because Healthcare Providers' claim presents only the failure of a plaintiff to submit an instruction against a defendant, however, we limit our discussion to that factual pattern.

Our court has previously addressed an analogous situation and found that the abandonment theory should be extended to a grant of a new trial. In *Benson Optical*

*Co. v. Floerchinger,* 810 S.W.2d 531, 533–34 (Mo.App.1991), a landlord sued a tenant for breach of a lease. Throughout the pleadings, the landlord clearly indicated his intention to bring suit against the tenant as an individual and as a corporation. *Id.* at 534. However, the distinction between the claims against the tenant as an individual and as a corporation disappeared at trial, and the landlord submitted the breach of lease claim only against the tenant individually. *Id.* We reversed the judgment against the tenant on grounds of an instructional error that prejudiced the tenant by assuming a fact that was for the jury to determine. *Id.* at 535. Because the landlord had failed to dismiss without prejudice its claim against the tenant's corporation and failed to submit that claim to the jury, we found the claim against the corporation was abandoned for purposes of the new trial. *Id.* at 536.

We find *Floerchinger* to be instructive. Furthermore, Daughters do not cite any authority to support their proposition that further action on Healthcare Providers' part was required to preserve this claim on appeal. Healthcare Providers' third point is granted.

The trial court's order for a new trial is affirmed as to Doctor and reversed as to Company. The cause is remanded for a new trial of Daughters' claims against Doctor.

CLIFFORD H. AHRENS, J., and CHARLES B. BLACKMAR, Sr. J., concur.