

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

Z.R., A MINOR, BY AND THROUGH )
HER MOTHER AND NEXT FRIEND, )
T.R. AND BY AND THROUGH HER )
FATHER AND NEXT FRIEND, R.R., )
                     )
        Respondents, )
                     )
v.                           )      WD85751
                     )
KANSAS CITY PEDIATRICS, LLC, )      Opinion filed:   October 31, 2023
AND SCOTT DATTEL, M.D., )
                     )
        Appellants. )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## THE HONORABLE JOHN TORRENCE, JUDGE

Division One: Edward R. Ardini, Jr., Presiding Judge, Anthony Rex Gabbert, Judge and Thomas N. Chapman, Judge

Scott Dattel, M.D., and Kansas City Pediatrics, LLC, ("Defendants") appeal the judgment of the Circuit Court of Jackson County granting Z.R.'s motion for new trial. The trial court granted Z.R.'s motion after a jury found in favor of Defendants on Z.R.'s claim for medical malpractice. The trial court determined that Z.R. was entitled to a new trial because a defense expert witness provided trial testimony that "directly contradicted" his earlier deposition testimony, this change in testimony was not disclosed to Z.R. prior to

trial, and the "undisclosed testimony unfairly resulted in substantial prejudice" to Z.R. For the reasons stated below, we affirm.

## Factual and Procedural Background

Z.R. brought this action—through her parents—asserting Defendants negligently failed to evaluate and treat her bilateral hip dysplasia when she was an infant.

### *Hip dysplasia*

Hip dysplasia—which is "usually seen in infants and young children"—refers to a spectrum of hip conditions concerning the fit of the femur into the acetabulum (the hip socket). Milder forms of hip dysplasia include a hip that is "a little bit loose" in the socket; the most severe form is a dislocated hip. An infant with hip dysplasia can also have "dislocatable" hips, meaning hips that move in and out of their sockets. Females born in the breech position have the highest risk of hip dysplasia. Bilateral hip dysplasia means both hips are affected.

Pediatricians routinely screen newborns for hip dysplasia. Such screening includes consideration of a child's risk factors and Ortolani and Barlow testing, which are physical manipulations of the child's hips. The Ortolani maneuver tests for a dislocated hip; the Barlow maneuver tests for a dislocatable hip.

If a pediatrician suspects hip dysplasia, referral to a pediatric orthopedist or ultrasonography imaging (an ultrasound) is recommended. An ultrasound is used to confirm or rule out a suspected diagnosis of hip dysplasia until an infant is four to six months old. After that age, X-rays or CT scans are used to diagnose hip dysplasia. Hip dysplasia is most often diagnosed while the child is a newborn.

2

Pavlik harnesses are commonly prescribed to treat infants diagnosed early with hip dysplasia. A Pavlik harness is a soft brace worn by an infant for two to three months, which "help[s] the joint form normally so that the child won't be in any elevated risk for hip surgery." An infant can begin wearing a Pavlik harness at one day old. Infants who wear Pavlik harnesses generally do not require surgery to treat their hip dysplasia.

*Z.R.'s history*

Z.R.—a female—was born in November 2015 in the Frank breech position via c-section delivery.[1] The physician at the hospital documented that, the day Z.R. was born, she had a left hip click.[2] Z.R. was "double diapered" while at the hospital. Double diapering does not provide any benefit to a child, but indicates the medical provider suspects the child has hip dysplasia. Z.R.'s parents noticed abnormalities in Z.R.'s hips soon after she was born, including "problems with movement."

Z.R. first visited Kansas City Pediatrics when she was three days old. She was examined by a physician's assistant who noted a right hip click. The physician's assistant also documented "negative Barlow and Ortolani Test." Z.R. was examined by Dr. Dattel and physician's assistants at Kansas City Pediatrics multiple times throughout 2016 and 2017. There were no other notations in Z.R.'s Kansas City Pediatrics records about hip

---

[1] In the Frank breech position, the infant's "hips are over [her] head." There was testimony at trial that an infant born in this position has a higher likelihood of having dislocated hips compared to an infant born in the regular breech position, where the infant's legs "are all kind of curled up."

[2] There was trial testimony that a dislocated hip, where "the ball is not in the socket" but "riding on the back of the pelvis," might produce "a little click."

clicks, and all subsequent examinations of Z.R.'s hips indicated that they were stable and had normal, active motion. Defendants' records did not contain any references to hip dysplasia or otherwise indicate a concern or suspicion that Z.R. had a hip abnormality. Defendants' records did not reference "any consideration of having referred [Z.R.] for pediatric orthopedist evaluation" or "any consideration of ordering an ultrasound" for Z.R.

In June 2018, Z.R. was seen by a doctor at Children's Mercy Hospital, who suspected Z.R. had hip dysplasia. An X-ray showed that both of Z.R.'s hips were dislocated, confirming a diagnosis of bilateral hip dysplasia. Z.R. underwent two surgeries in the summer of 2018, one on each hip, to put her hips back in their sockets.[3] Z.R. underwent a third surgery in August 2019 to remove the hardware in her hips.

*Litigation*

Z.R. initiated this action in January 2020. In July 2021, Defendants deposed Z.R.'s causation expert ("Z.R.'s Expert"), an orthopedic surgeon who specialized in pediatric orthopedics. Two months later, Z.R. deposed Defendants' causation expert ("Defense Expert"), also an orthopedic surgeon who specialized in pediatric orthopedics. Defense Expert testified at his deposition that a child can be born with one or both hips dislocated, and that he could not rule out that Z.R. had been born with dislocated hips. He further testified that an ultrasound could have been safely performed on Z.R. starting "at the first day of [her] life" to diagnose her hip dysplasia, an orthopedic referral "could have been

---

[3] Specifically, Z.R. underwent on each hip "an open reduction" and "a pelvic osteotomy and a femoral shortening osteotomy." An osteotomy is a "[c]utting of the bone." "[S]hortening of the hip puts the hip back into the socket with the least amount of pressure on it[.]"

4

done" before Z.R. was four months old to diagnose her hip dysplasia, and if Z.R. had been diagnosed "in an early period, and if treatment had been administered in the form of [a] Pavlik Harness, much more likely than not [Z.R.] could have avoided surgery on one or both hips."

A six-day jury trial commenced in June 2022. Defendants' theory of the case was that Z.R. developed late onset hip dysplasia, which was not present or diagnosable during the time she was a patient of Dr. Dattel. The last time Dr. Dattel examined Z.R. was in August 2017, when she was 20 months old.

Z.R.'s Expert and Defense Expert testified at trial.[4] Z.R.'s Expert opined that it was most likely Z.R.'s hips were dislocated when she was born and had remained dislocated. He expected that, had an ultrasound been performed when Z.R. was six to eight weeks old, it would have established Z.R. had dislocated hips. He testified that if Z.R.'s hips were "completely dislocated at birth," he nonetheless would expect her to "have a good outcome" with the use of a Pavlik harness.

Defense Expert testified that if Z.R.'s hips were dislocated at birth, the use of a Pavlik harness would not have been an effective treatment:

> Q. [Z.R.'s Expert] said that based on what he is seeing here [in Z.R.'s pre-surgical X-ray], [Z.R.'s] hips were never located. Do you agree with that?
>
> A. I'm not sure I would say that. I'm not sure anybody knows that.
>
> Q. Why do you have that opinion?

---

[4] The only trial transcript we have been provided in this appeal is the transcript of these two expert witnesses' testimony, as well as the parties' closing arguments.

5

A. Because they came out sometime. But if somebody is born with hips out of the socket immediately and they don't go back in, that is a bit of a different thing than standard dislocated hip.

Q. And what is that thing? Is there a medical term?

A. There is. It's called a teratologic dislocation. Which means it was destined to be dislocated from conception, which is a different thing.

Q. Can you give the jury just a little bit of explanation about what a teratologic dislocation is like?

A. A teratologic hip is dislocated even before birth. It won't go back in the socket. That anatomy is abnormal. And they are a whole lot harder to treat.

. . .

Q. . . . [W]hat we are talking about now is [Z.R.'s Expert's] testimony yesterday, that if you were dealing with a child whose hips had dislocated and stayed dislocated, would a Pavlik harness have made any difference in her outcome?

A. Almost for sure not.

. . .

Q. So if you believe [Z.R.'s Expert's] testimony was hip dislocated at birth and remained dislocated, and also that if she have [sic] been given a Pavlik harness in the first three to six months that her outcome would have been essentially she wouldn't have the degenerative disc disease, she wouldn't need a hip replacement,[5] she would have had a good outcome, can you believe both of those at the same time?

A. No.[6]

---

[5] There was testimony that children with hip dysplasia who have surgical intervention to relocate their hips "generally" have hip replacements later in life.

[6] Z.R. objected to this testimony on the grounds that it was a new opinion of Defense Expert that had not been previously expressed or otherwise disclosed to Z.R. The objection was overruled. We note, however, that a trial court may grant a motion for new trial based on the improper admission of evidence even if the movant does not object to the evidence during trial. *See Pasalich v. Swanson*, 89 S.W.3d 555, 562 (Mo. App. W.D. 2002) ("A trial court has the right, in the proper

6

At the conclusion of the trial, the jurors were instructed that they must find in favor of Z.R. if they believed:

First, Defendant Dattel either:

failed to order an ultrasound test of [Z.R.'s] hip to be performed approximately six to eight weeks after [Z.R.'s] birth, or

failed to timely refer [Z.R.] to a pediatric orthopedic surgeon for evaluation of her hips within the first four months of her life, and

Second, Defendant Dattel in any one or more of the respects set forth in paragraph First, was thereby negligent,[7] and

Third, such negligence directly caused or directly contributed to cause damage to Plaintiff.

After two days of deliberation, nine of the twelve jurors returned a verdict in favor of Defendants.[8] Z.R. filed a motion for new trial asserting, among other claims, that Defense Expert's trial testimony "contradicted material opinions he expressed in [his] deposition that directly addressed core issues in this case." Specifically, Z.R. asserted that "[a]t trial, for the first time, [Defense Expert] offered testimony that if [Z.R.'s Expert] was correct that [Z.R.] was born with dislocated hips, that would have meant that she was born with a 'teratologic dislocation' for which a Pavlik harness was useless."

---

exercise of its discretionary power, to grant a new trial on account of any erroneous ruling, whether an objection has been made or not.").

[7] The term "negligent" was defined in a separate instruction to mean "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of Defendant Dattel's profession."

[8] In a Missouri civil case, "unanimous verdicts are not required. Rather, 9 of the 12 jurors may agree to a verdict." *Rodgers v. Jackson Cty. Orthopedics, Inc.*, 904 S.W.2d 385, 387 n.2 (Mo. App. W.D. 1995).

The trial court granted Z.R.'s motion for new trial, concluding that Defense Expert's trial testimony "directly contradicted [his opinion] that was disclosed in discovery." The trial court found that Defense Expert "testified in his discovery deposition that ultrasound could have identified [Z.R.'s] hip dysplasia in the first few months of her life and that, if hip dysplasia would have been so identified, the simple use of a Pavlik harness would likely have done away with the dysplasia and avoided the need for surgery." The trial court found that when testifying at trial, however, Defense Expert opined that if Z.R.'s Expert "was correct in believing that [Z.R.] was actually born with dislocated hips (an opinion of [Z.R.'s Expert] found in his discovery deposition that was available for [Defense Expert] to review before [he] was deposed), it meant that [Z.R.] suffered teratologic hip dislocations" and that such "hip dislocations cannot be cured with the use of a Pavlik harness and consequently, this simple use of the harness would not have avoided surgery for [Z.R.]." The trial court determined that the "substantial prejudice" to Z.R. resulting from this change in testimony could only be corrected by ordering a new trial.

Defendants appeal, asserting "the stated basis for the trial court's granting of Plaintiff's new trial motion was erroneous."

**Standard of Review**

"On a motion for new trial, a trial court may reconsider its rulings on discretionary matters and may order a new trial if it believes its discretion was not wisely exercised and that the losing party was thereby prejudiced." *Estate of Overbey v. Franklin*, 558 S.W.3d 564, 571 (Mo. App. W.D. 2018). "The admissibility of evidence, including the testimony of an expert, is a matter within the discretion of the trial court." *Whitted v. Healthline*

8

*Mgmt., Inc.*, 90 S.W.3d 470, 474 (Mo. App. E.D. 2002) (quoting *Cooper v. Ketcherside*, 907 S.W.2d 259, 260 (Mo. App. W.D. 1995)).

"The trial court is vested with broad discretion to grant a new trial, and our review gives substantial deference to such ruling." *Estate of Overbey*, 558 S.W.3d at 570. "In reviewing a trial court's decision to sustain a motion for new trial, this Court applies a rule of greater liberality than in denying it." *Id.* (internal marks omitted). "Owing to this standard of greater liberality, our review of the trial court's ruling granting a new trial is to indulge every reasonable inference in favor of the trial court and [we] may not reverse unless there has been a clear abuse of discretion." *Id.* (internal marks omitted). An abuse of discretion occurs when the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a careful lack of consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Sherar v. Zipper*, 98 S.W.3d 628, 632 (Mo. App. W.D. 2003).

"Discovery rules and case law establish the principle that when an expert witness has been deposed and later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new information to his adversary, thereby updating the responses made in the deposition." *Beverly v. Hudak*, 545 S.W.3d 864, 869-70 (Mo. App. W.D. 2018) (emphasis and internal marks omitted); *see also Shallow v. Follwell*, 554 S.W.3d 878, 881 (Mo. banc 2018). "If an expert provides different testimony from that

9

disclosed in discovery, then the trial court is vested with discretion to determine how to remedy the situation." *Beverly*, 545 S.W.3d at 870.

**Analysis**

In their sole point on appeal, Defendants assert the trial court erred in granting Z.R.'s motion for new trial "because Defendants' causation expert did not testify that [Z.R.] had a teratologic hip nor did he testify that Z.R. could not have been successfully treated with a Pavlik harness, therefore the stated basis for the trial court's granting of [Z.R.'s] new trial motion was erroneous and [Z.R.] could not have suffered prejudice from testimony that was never given."[9] We disagree.

At the outset, we note that even if the "stated basis" of the trial court's ruling were erroneous—which we do not find in this appeal—we are ultimately concerned with the result reached by the trial court, and we will affirm the trial court's ruling if it is sustainable on any ground supported by the record. *See Vescovo v. Kingsland*, 628 S.W.3d 645, 654 (Mo. App. W.D. 2020) ("Because we are primarily concerned with the correctness of the result, rather than the course taken in order to reach it, we will affirm the trial court's judgment if it is correct on any ground supported by the record regardless of whether the trial court relied on that ground." (internal marks omitted)). Here, the trial court determined

---

[9] Defendants' point relied on does not comply with Rule 84.04(d)(1) because it is not "substantially [in] the following form: 'The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*].'" Moreover, the argument section of Defendants' brief exceeds the scope of the point relied on in violation of Rule 84.04(e) ("The argument shall be limited to those errors included in the "Points Relied On."); *see also Wilson v. Trusley*, 624 S.W.3d 385, 399 n.13 (Mo. App. W.D. 2021) (an argument that exceeds the scope of the point relied on is not preserved for appellate review). Despite these violations of the briefing rules, we exercise our discretion to review the merits of Defendants' claims.

that Defense Expert testified to a new opinion at trial that contradicted his deposition testimony, resulting in prejudice to Z.R. warranting a new trial. We discern no abuse of discretion in that determination.

Defense Expert testified in his deposition that Z.R. could have been born with dislocated hips and early diagnosis and treatment with a Pavlik harness likely would have resolved her condition without the need for surgery. Specifically, he testified that a child can be born with dislocated hips, he could not rule out that Z.R. was born with dislocated hips, and "if this diagnosis of hip dysplasia, if it was diagnosed in an early period, and if treatment had been administered in the form of Pavlik Harness, much more likely than not [Z.R.] could have avoided surgery on one or both hips." Defense Expert did not qualify his testimony or otherwise state that the result would be different if Z.R.'s hips were "teratologic" or if Z.R. was born with dislocated hips that remained dislocated.

However at trial, for the first time, Defense Expert testified that if Z.R. was born with dislocated hips that remained dislocated, a Pavlik harness would not have treated her condition. He testified that if a child is born with "hips out of the socket immediately and they don't go back in," that is "called a teratologic dislocation," which "is a different thing" that is "a whole lot harder to treat." He stated that if "you were dealing with a child whose hips had dislocated and stayed dislocated," a Pavlik harness "[a]lmost for sure" would not have made any difference in her outcome. When asked on direct examination if there could be an explanation other than a teratologic dislocation if Z.R. "had dislocated hips at birth

and that dislocation remained there," he responded, "if they were irreducible[10] from birth, it generally is considered to be teratologic." He also testified that "if you believe" Z.R.'s Expert's testimony that Z.R. had hips dislocated at birth that remained dislocated, you could not also believe that "if she had been given a Pavlik harness in the first three to six months" that "she would have had a good outcome."

Defense Expert plainly testified to a new opinion at trial which was substantially different than his deposition testimony when he opined that hips that are dislocated at birth and remain dislocated are only consistent with a teratologic dislocation, and a Pavlik harness would not have treated Z.R.'s hips if they were teratologic. Defendants did not disclose this change in opinion to Z.R. prior to trial, and thus this was "surprise" testimony entitling Z.R. to relief. *See Sherar*, 98 S.W.3d at 634 (a party is entitled to relief when the party is "genuinely surprised at trial when an expert witness suddenly has an opinion where he had none before, renders a substantially different opinion than the opinion disclosed in discovery, uses new facts to support an opinion, or newly bases that opinion on data or information not disclosed during the discovery deposition"). The trial court was within its discretion to grant Z.R. relief by ordering a new trial. *See Whitted*, 90 S.W.3d at 477 (trial court did not abuse its discretion in awarding the plaintiffs a new trial on the basis of "inconsistent testimony" where the defense expert's deposition testimony as to the cause of death differed from his trial testimony); *see also Pasalich v. Swanson*, 89 S.W.3d 555,

---

[10] "Irreducible" means "unable to be returned to the normal position or condition." *Irreducible*, Mosby's Medical Dictionary (7th ed. 2006).

561-62 (Mo. App. W.D. 2002) (trial court did not abuse its discretion in granting the plaintiff a new trial where the defense expert offered a new opinion at trial as to what caused the plaintiff's injuries and did not disclose the change in opinion prior to trial).

The claim of error raised in Defendants' point relied on focuses narrowly on two factual findings of the trial court. Defendants assert that Defense Expert "did not testify that [Z.R.] had a teratologic hip nor did he testify that [Z.R.] could not have been successfully treated with a Pavlik harness" and the trial court erroneously found otherwise. But Defendants' argument fails to consider the entirety of Defense Expert's testimony.

First, we find that, contrary to Defendants' claim on appeal, Defense Expert did testify that Z.R. had teratologic hips:

> Q. [by Z.R.'s counsel:] Okay. We know that [Z.R.] had all these, these physical examinations, the Barlow and Ortolani, also, the abduction and adduction. And it was always said that she was normal. Are you saying that she had these teratologic hips even though nobody picked up anything abnormal with the hips when she was being tested?
>
> A. I am. Because the Ortolani and Barlow relied on if the hip relocated. In a teratologic hip, it won't relocate. That is the reason.
>
> Q. Well, shouldn't it, if the hips are dislocated, shouldn't somebody be picking up on that?
>
> A. The Ortolani and Barlow are not accurate on a teratologic. They don't go back in the socket.
>
> Q. All right. But somebody should notice you've got all this laxity, shouldn't they?
>
> A. And that is the point. There is no laxity. The hips are out of socket and won't go back in. That is what a teratologic hip is.

Defendants ignore this testimony—as well as Defense Expert's testimony that he could not "actually say one way or the other" whether Z.R. had teratologic hips—instead citing solely

13

to Defense Expert's statements at trial that he was not taking the position that Z.R. had teratologic hips.[11] Although Defense Expert did provide conflicting testimony as to whether he believed Z.R. had teratologic hips, Defendants' claim that he never asserted Z.R. had teratologic hips is factually incorrect.

When viewed as a whole, the import of Defense Expert's testimony relating to teratologic hips was that if Z.R. had them, she could not have been successfully treated with a Pavlik harness. And, as discussed above, there was testimony at trial from Defense Expert that Z.R. had teratologic hips. Thus, we find no merit to Defendants' claim that the trial court's factual findings were erroneous.

Defendants raise additional challenges to the trial court's ruling that were not included in their point relied on. Defendants argue that the "first time [Z.R.'s Expert] testified that [Z.R.'s] hip joints remained out of socket until diagnosed at thirty months was at trial," and thus "the trial court's ruling incorrectly states that [Z.R.'s Expert] disclosed his opinion that [Z.R.] was born with a dislocated hip that remained dislocated until diagnosis during his discovery deposition." Defendants contend that having Defense Expert "respond to something [Z.R.'s Expert] said the first time during trial did not prejudice [Z.R.]." To support this argument, Defendants cite to Z.R.'s Expert's deposition testimony that an ultrasound at two weeks would have found Z.R.'s hips were "either dislocated or dislocatable." However, a review of the entirety of Z.R.'s Expert's deposition

---

[11] Indeed, to take the position that Z.R. had teratologic hips would be contrary to the defense's theory that Z.R. developed hip dysplasia after she was 20 months old.

testimony reflects an opinion that Z.R.'s hips were dislocated at birth and remained dislocated until she was diagnosed with hip dysplasia at 30 months.

Z.R.'s Expert stated in his deposition that "[i]n developmental hip dysplasia," sometimes the hips are dislocated at birth and sometimes the dislocation occurs after birth, and in describing Z.R.'s hip dysplasia, he testified that "[s]he's the one who was out at birth." He also testified that he believed her hips were dislocated at the time of her 2-, 4-, and 6-month medical appointments and the fact that she was born with dislocated hips could have contributed to the shallowness of her acetabulum that was visible in the X-ray taken when she was 30 months old. This testimony was sufficient to apprise Defendants that Z.R.'s Expert was of the opinion Z.R. was born with dislocated hips that remained dislocated until her surgery.

Defendants also argue that Z.R.'s counsel "manufacture[d] a claim of surprise" by failing to "ask all of the questions he needed to ask in order to discover [Defense Expert's] opinions." Defendants contend that Z.R.'s counsel "did not ask [Defense Expert] about a teratologic dislocation during his deposition, if [Z.R.]'s hips were ever located, or the efficacy of a Pavlik harness in this unique situation."

First, we disagree that Defense Expert was never asked in his deposition about a child being born with dislocated hips that remained dislocated. Although Z.R.'s counsel did not use the term "teratologic," he did ask Defense Expert a series of ten questions premised on the idea that Z.R. "was born with dislocated hips that remained dislocated." Furthermore, Defense Expert acknowledged at his deposition the possibility that Z.R. was born with dislocated hips and still opined that "if treatment had been administered in the

15

form of Pavlik Harness, much more likely than not she could have avoided surgery on one or both hips." Defense Expert never qualified his answer or otherwise stated that this would only be his opinion if Z.R. did not have a teratologic dislocation, as he did at trial. In short, we find Defense Expert was given the opportunity in his deposition to assert his opinion that dislocated hips that remain dislocated are only consistent with teratologic dislocations that are not effectively treated with a Pavlik harness.

Finally, Defendants argue that "any variance between [Defense Expert's] deposition and trial testimony was minute and immaterial," and that "there was no need to take the drastic step of undoing the verdict reached by the jury" where Z.R. "had the opportunity to, and did cross-examine [Defense Expert] with this 'new' opinion at trial." But the trial court was within its discretion to conclude that Z.R.'s ability to cross-examine or impeach Defense Expert on his new opinion at trial was insufficient to mitigate the prejudice suffered by Z.R. from the surprise trial testimony. *See Pasalich*, 89 S.W.3d at 562-63 (the trial court did not abuse its discretion in finding the plaintiff was sufficiently prejudiced by surprise expert testimony to warrant a new trial, even though the plaintiff cross-examined the expert at trial "on the variances of his opinion and attack[ed] his credibility").

For these reasons, we find the trial court did not abuse its discretion in granting Z.R.'s motion for new trial on the grounds that Defense Expert provided surprise testimony at trial. Point denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.